FILED
CLERK, U.S. DISTRICT COURT

JUL 1 2 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

SINGH, SINGH & TRAUBEN, LLP
MICHAEL TRAUBEN, ESQ. (SBN: 277557)
   mtrauben@singhtraubenlaw.com
400 S. Beverly Drive, Suite 400
Beverly Hills, CA 90212
Tel:   310-856-9705
Fax:   888-734-3555

*Attorneys for Plaintiffs*
Raymond Downing and Studio Macbeth, Inc.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

RAYMOND DOWNING, an individual and
STUDIO MACBETH, INC., a New York
corporation,

        Plaintiffs,

        v.

LEFT RIGHT, INC., a New York corporation
and A&E TELEVISION NETWORKS, LLC,
a Delaware limited liability company,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: CV12-06011 PSML (AJWx)

COMPLAINT FOR:

1. COPYRIGHT INFRINGEMENT;
2. BREACH OF CONTRACT;
3. UNJUST ENRICHMENT;
4. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;
5. ACCOUNTING;
6. VIOLATION OF N.Y. CIV. RIGHTS LAWS §50 AND §51; and
7. FRAUD

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs, Raymond Downing ("Downing") and Studio Macbeth, Inc. ("Studio Macbeth") (collectively "Plaintiffs"), by and through their undersigned counsel, hereby file their Complaint against Left Right, Inc. ("Left/Right") and A&E Television Networks, LLC ("A&E") (collectively "Defendants") and in support thereof allege as follows:

## NATURE OF ACTION

1.    This is a civil action seeking damages and injunctive relief for copyright infringement arising under 17 U.S.C. §§ 501, *et seq* (referred to herein as the "Copyright Act"),

1  and other related causes of action.

2  ## THE PARTIES

3  2.    Plaintiff Downing is an individual residing in Ulster County, New York.

4  3.    Plaintiff Studio Macbeth is a New York Corporation with its principal place of

5  business in Ulster County, New York.

6  4.    Upon information and belief, Defendant Left/Right creates documentary

7  television and film projects and is a New York corporation with its principal place of business in

8  New York, New York.

9  5.    Upon information and belief, Defendant A&E is a United States-based cable and

10  satellite television network and is a Delaware limited liability company with its principal place of

11  business in New York, New York with offices in Atlanta, Chicago, Detroit, London and Los

12  Angeles.

13

14  ## JURISDICTION AND VENUE

15  6.    Federal jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1338 in

16  that the controversy arises under the Copyright Act of 1976 (17 U.S.C. §§ 101, *et seq*).  This

17  Court also has jurisdiction over Plaintiffs' state law claims under the general supplemental

18  jurisdiction of this Court under 28 U.S.C. §1367.

19  7.    Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendants'

20  conduct resulted in actionable conduct within this District and all Defendants are subject to the

21  Court's personal jurisdiction with respect to this action.

22  8.    This Court has personal jurisdiction over Defendants on the grounds that they are

23  doing business in this State and District and have purposefully availed themselves of the

24  jurisdiction of this Court by engaging in frequent and substantial business activities in this State

25

**Singh,
Singh &
Trauben,
LLP**

1    and District and by transacting business in this District and the State of California concerning the

2    virtual works and audio-visual works and copyrighted materials at issue in this action.

3            9.      Defendants Left/Right and A&E both prepare, among other things, television

4    programming that is distributed and transmitted in the State of California and within this District.

5    Defendants Left/Right and A&E have further distributed and transmitted within this State and

6    District television programming that used Plaintiff Studio Macbeth's copyrighted virtual works

7    and audio-visual works without authorization.

8                                        **FACTUAL ALLEGATIONS**

9
10          10.     Plaintiff Downing is an established creator and developer of 3D computer

11   graphics in the commercial, advertising and communications arenas with a specialization in

12   medical and scientific imaging.

13          11.     Plaintiff Downing is also a 2010 Emmy award-winning 3D digital illustrator and

14   animator whose career has spanned over 35 years.

15          12.     Plaintiff Downing founded Plaintiff Studio Macbeth in 1979, and the company

16   has continued to evolve as technologies adapted from manual analog to today's digital media.

17          13.     Plaintiff Studio Macbeth is engaged in the development of, among other things,

18   3D computer graphics in the broadcast television and entertainment industries.

19
20          14.     Plaintiff Studio Macbeth was one of the first companies to recognize the potential

21   of 3D computer graphics and has explored those possibilities for the past 21 years.

22          15.     In 2008, Plaintiff Studio Macbeth launched an initiative to establish itself in the

23   broadcast television and entertainment industries. The first such undertaking for Studio Macbeth

24   in this regard was the creation of a virtual depiction of former United States President Abraham

25   Lincoln.

Singh,
Singh &
Trauben,
LLP

*PLAINTIFFS RAYMOND DOWNING AND STUDIO MACBETH'S COMPLAINT - 3*

### The Three License Agreements

#### 1. *Stealing Lincoln's Body*

16.     In or around February 2008, Plaintiff Studio Macbeth contacted Carl Lindahl ("Lindahl"), then Executive Producer for History f/k/a the History Channel ("History"), owned and operated by Defendant A&E, regarding the virtual depiction of former President Abraham Lincoln, wholly-developed and created by Plaintiff Studio Macbeth (the "Virtual Lincoln").

17.     For purposes of clarification, the Virtual Lincoln, wholly-developed and created by Plaintiff Studio Macbeth, is a 3D computer graphics animated likeness of former President Abraham Lincoln.  This computer model has yielded a collection of unique and original images and animations of Abraham Lincoln.  These virtual depictions of President Lincoln vary widely in duration, mood, lighting and style.

18.     In response thereto, Lindahl expressed his strong desire on behalf of History to purchase a license for the use of certain graphic animation sequences of the Virtual Lincoln for inclusion in a History television program entitled "Stealing Lincoln's Body" (the "Lincoln Program").

19.     In connection with History's desire to purchase this license, Lindahl instructed Studio Macbeth that any such purchase by History of a license to exploit the Virtual Lincoln, including any associated works, must be made by and through History's preferred vendor, Defendant Left/Right.

20.     Consistent with this directive, in or around February 2009, Defendant Left/Right, acting as an agent for History, entered into an agreement with Studio Macbeth for the purposes of licensing nine (9) specific and distinct graphic animation sequences of Studio Macbeth's wholly created and developed Virtual Lincoln (the "Lincoln Agreement").  A true and correct

copy of the Lincoln Agreement is attached hereto as Exhibit "A."

21.     Pursuant to the express terms of the Lincoln Agreement, Defendant Left/Right's contractual right to exploit these nine (9) graphic animation sequences developed by Studio Macbeth was unequivocally limited to the production of the Lincoln Program.

22.     Specifically, pursuant to Paragraph 2 of the Lincoln Agreement, all rights Studio Macbeth granted to Defendants regarding the Virtual Lincoln were expressly non-transferable, non-sublicensable and related solely to the Lincoln Program for the History Channel.

23.     Notably, such non-transferability excluded History from licensing the Virtual Lincoln, and associated materials developed by Plaintiffs through their affiliate channels, like History 2.

24.     In reliance on these strict and material terms of the Lincoln Agreement, Plaintiff Studio Macbeth delivered and Defendants readily-accepted and thereafter exploited the Virtual Lincoln materials on the Lincoln Program to much critical acclaim and financial success.

25.     Specifically, on or around February 16, 2009, Defendants commenced broadcasting the Lincoln Program through, among other outlets, Defendant A&E's History Channel, and continue to broadcast, distribute and/or make available for sale a DVD of the Stealing Lincoln's Body program through, among other online retailers, Amazon.com and Defendant A&E's own website.

### 2. *Resurrecting Jesus*

26.     Subsequently, on or around January 30, 2009, Lindahl, in his capacity as Executive Producer for History, personally visited Plaintiff Studio Macbeth's studio whereby he witnessed an exhibition by Studio Macbeth with respect to its next project involving the 3D digital recreation of the face of Jesus from the Shroud of Turin (the "Virtual Jesus").

27.     For clarification, the Shroud of Turin is a linen cloth bearing the image of a man who appears to have suffered physical trauma in a manner consistent with crucifixion, kept in the royal chapel of the Cathedral of Saint John the Baptist in Turin, northern Italy.

28.     In response thereto, Lindahl, on or around February 2, 2009, contacted Studio Macbeth to confirm that A&E had "greenlighted" a project for production involving Studio Macbeth's creation of the 3D digital recreation of the face of Jesus from the Shroud of Turin.

29.     Thereafter, in or around June 2009, continuing to act in its capacity as an agent for Defendant A&E, Left/Right entered into another contract with Studio Macbeth, and this time additionally with Plaintiff Downing individually, for the purposes of, among other things, obtaining for History the valuable license rights to certain Virtual Jesus materials Studio Macbeth was creating (the "Real Face of Jesus Agreement").  A true and correct copy of the Real Face of Jesus Agreement is attached hereto as Exhibit "B."

30.     In accordance with the Real Face of Jesus Agreement, Studio Macbeth granted History the rights to use certain and distinct graphic animation sequences of Studio Macbeth's wholly-created and developed Virtual Jesus in connection with the particular production "Resurrecting Jesus", which working title was later changed to "The Real Face of Jesus?" (the "Real Face of Jesus Program").

31.     Thereafter, on or around March 20, 2010, Defendants commenced broadcasting the Real Face of Jesus Program through, among other outlets, Defendant A&E's History Channel, and continue to broadcast, distribute and/or make available for sale a DVD of the Real Face of Jesus Program through, among other online retailers, Amazon.com and Defendant A&E's own website.

32.     Once again, pursuant to the Real Face of Jesus Agreement, Defendants use of

Singh,
Singh &
Trauben,
LLP

these valuable license rights were to be strictly limited to use in connection solely with the production of the Real Face of Jesus Program for the History Channel.

33.     Specifically, pursuant to Paragraph 2 of the Real Face of Jesus Agreement, all rights Studio Macbeth granted to Defendants regarding the Virtual Jesus were expressly non-transferable, non-sublicensable and related solely to the Real Face of Jesus Program for the History Channel.

34.     Notably, such non-transferability excluded History from licensing the Virtual Jesus, and associated materials developed by Plaintiffs through their affiliate channels.

35.     In addition, Plaintiff Downing, pursuant to the terms of the Real Face of Jesus Agreement, and in connection solely with the production of the Real Face of Jesus Program, agreed to license his name and likeness and further provide his professional services which included, among other things, co-producing, consulting, researching, and personally appearing on camera.

36.     Likewise, Defendants' right to exploit Plaintiff Downing's name and likeness in connection with the production services provided for in the Real Face of Jesus Program was limited solely to the production of the Real Face of Jesus Program for the History Channel.

37.     Moreover, pursuant to the terms of the Real Face of Jesus Agreement, in the event Defendant Left/Right requested additional materials above and beyond those encompassed by the licenses granted in connection with the Real Face of Jesus Agreement, specifically, ten (10) graphic animation sequences, Defendant Left/Right would be required to compensate Plaintiffs the all-inclusive sum of Ten Thousand Dollars ($10,000.00) for each such additional graphic animation sequence requested.

Singh,
Singh &
Trauben,
LLP

PLAINTIFFS RAYMOND DOWNING AND STUDIO MACBETH'S COMPLAINT - 7

### 3. *Lost 40 Days*

38.    Given the overwhelming success of both the Lincoln Program and the Real Face of Jesus Program, including an Emmy awarded to Plaintiff Downing with respect to his work on the Lincoln Program, Plaintiff Studio Macbeth proceeded to develop another original concept designed for a television production.

39.    Specifically, surrounding the 40 days whereby Jesus of Nazareth walked on Earth after his resurrection or, alternatively, the New Testament's post resurrection accounts, Studio Macbeth envisioned a show at the crossroads of science and faith: a scientific investigation guided by modern-day physics, historical analysis, and archaeological discoveries into the post-resurrection accounts found in the New Testament.

40.    In furtherance thereof, Studio Macbeth approached Lindahl in or around April 2010 to discuss this particular television production, which discussion spawned the coordination by Lindahl of yet another meeting between Plaintiff Downing, Lindahl and A&E's preferred vendor, Defendant Left/Right.

41.    Accordingly, Plaintiffs met with Defendant Left/Right and Lindahl to discuss a production involving Studio Macbeth's creation of several 3D graphic animation sequences of the Virtual Jesus of Nazareth (collectively the "Jesus Animations").

42.    This production would ultimately be entitled "Jesus: the Lost 40 Days" (the "Lost 40 Days Program").

43.    Specifically, Plaintiff Downing met at History's offices on or around May 12, 2010 with, among others, Lindahl and Defendant Left/Right's executive producer and co-owner, Kenneth Druckerman ("Druckerman"), to discuss the scientific content Defendants represented and promised would be included in the Lost 40 Days Program.

44.     Thereafter, following additional communications regarding thematic approaches for the Lost 40 Days Program, Plaintiff Downing met at Plaintiff Studio Macbeth's offices on or around September 22, 2010 with, among others, Left/Right's producer of the Lost 40 Days Program, John Marks ("Marks"), wherein Marks provided further assurances to Downing with respect to the represented heavy scientific content and participation of historians, scientist and archeologists to be included within the Lost 40 Days Program.

45.     Additionally, Plaintiffs' meetings with representative of Defendant Left/Right and Lindahl further discussed Plaintiff Downing's involvement as a producer on the Lost 40 Days Program, specifically in relation to the production's development and investigation of particular scientific elements, including, among other scientific matters, the following:

        a.     the science of space and time;

        b.     the second dimension in relation to the third dimension;

        c.     holograms;

        d.     the physics of observer dependence;

        e.     Schrödinger's cat;

        f.     electromagnetic interactions; and

        g.     on camera experiments relating to perception and information encoding;

(collectively hereafter the "Scientific Elements").

*Defendants' Fraudulent Inducement Related to the Lost 40 Days License Agreement*

46.     Unbeknownst to Plaintiffs, Defendants were in fact not interested in any scientific inquiry into these New Testament events, and notwithstanding any and all material representations to the contrary, Defendants were solely interested in the exploitation of Plaintiff Studio Macbeth's original Jesus Animations which could not be duplicated or otherwise re-

created by Defendants.

47.     Consequently, cloaked under the guise of Defendants being fully-interested in the production of Plaintiffs' programming concept, at a later meeting in or around October 2010, in an effort to induce Plaintiffs' agreement to license Plaintiff Studio Macbeth's original and valuable Jesus Animations for exploitation in the Lost 40 Days Program, Defendant A&E made several additional material false representations and assurances to Plaintiffs, which representations were further entrenched and encompassed in an official written prospectus of the Lost 40 Days Program (the "Prospectus").

48.     Specifically, Defendant A&E, by and through Lindahl, and Defendant Left/Right, by and through Druckerman and Marks, again expressly represented that the Lost 40 Days Program would be a critical, historical, and scientific investigation into the events described in the New Testament's post-resurrection accounts.

49.     Further, Defendants' Prospectus outlined both the inclusion of the Scientific Elements as previously described, in addition to several interviews with prominent physicists for inclusion in the Lost 40 Days Program.

50.     Based on the foregoing material representations and promises, Plaintiffs, in or around November 2010, entered into another agreement with Defendant Left/Right, again acting in the capacity of an agent of Defendant A&E, for the purposes of, among other things, licensing the rights to the specifically-identifiable and valuable graphic animation sequences of the Jesus Animations for the specific inclusion in the Lost 40 Days Program (the "Lost 40 Days Agreement") (the Lincoln Agreement, the Real Face of Jesus Agreement, and the Lost 40 Days Agreement are hereinafter collectively be referred to as the "License Agreements").    A true and correct copy of the Lost 40 Days Agreement is attached hereto as Exhibit "C."

Singh,
Singh &
Trauben,
LLP

51.    Defendants knew that, at all times, Plaintiffs were heavily-relying upon the foregoing material and knowingly false representations, including the written Prospectus, in agreeing to enter into the Lost 40 Days Agreement.

52.    At the time Defendants made the foregoing material representations and promises to Plaintiffs, Defendants had no intention of acting upon the specific promises and representations as set forth in the Prospectus, and knew that such representations were false when made.

53.    Notwithstanding that the Scientific Elements, historical content and Physicist interviews were explicitly outlined in the Prospectus, Defendants never allocated any funding for the development of such materials, which included, without limitation, scientific or historical experts, on-camera scientific experiments, scientific reenactments, and scientific graphics.

54.    Specifically, beyond the initial Prospectus itself, Defendants never allocated any funding or time into the development or production of the Scientific Elements, or in reality any non-faith based inquiries, for inclusion in the Lost 40 Days Program.

55.    As such, rather than being produced as a critical, historical, and scientific investigation into the events described in the New Testament's post resurrection accounts, the Lost 40 Days Program resulted in a purely religious exposition into these matters.

56.    The Lost 40 Days Program, as broadcast and currently sold on DVD, contains no investigation or mention of the Scientific Elements, and features no interviews with any scientists, purposefully excluding all physicists.

57.    Specifically, on or around April 20, 2011, Defendants commenced broadcasting the Lost 40 Days Program through, among other outlets, Defendant A&E's History Channel, and continue to broadcast, distribute and/or make available for sale a DVD of the Lost 40 Days

Program through, among other online retailers, Amazon.com and Defendant A&E's own website.

### Exclusivity and Limited Nature of Licenses

58.    Regarding the specific rights set forth in the Lost 40 Days Agreement, these license rights, among other contractual rights, were for the sole and singular use and exploitation for the "Lost 40 Days Program" for the History Channel.

59.    Notably, such non-transferability excluded History from licensing the Jesus Animations, and associated materials developed by Plaintiffs through their affiliate channels.

60.    In particular, pursuant to "Schedule 1" of the Lost 40 Days Agreement, Studio Macbeth granted to Defendants licensing rights in relation to six (6) post-resurrection graphic animation sequences of the Jesus Animations.

61.    In accordance with the express terms of the Lost 40 Days Agreement, in the event that Defendants required and/or requested additional materials beyond those specifically referenced in the attached "Schedule 1", Defendant Left/Right would be obligated to compensate Studio Macbeth a mutually agreed-upon fee, including any and all costs associated therewith upon delivery, for each such additional graphic animation sequence.

### Defendants' Clear and Unequivocal Breaches of the License Agreements and Intentional Unauthorized Use of Plaintiffs' Works

### The Lincoln Agreement

62.    As set forth above, Paragraph 2 of the Lincoln Agreement, entitled "Grant of Rights," explicitly provides in part that "[t]hese rights are non-transferable, non-sublicensable, and *relate only to this particular Production.*"  (Emphasis supplied).

63.    In addition, Paragraph 1 of the Lincoln Agreement expressly provides, in part, that Left/Right "has conferred with the History Channel and represents that they have reviewed the

work and desire to license it for inclusion as delivered."

64.    Moreover, Paragraph 1 of the Lincoln Agreement then makes plain that "[a]ll the terms of this agreement refer only to these Materials and to their inclusion only in this particular television production and to the promotion and exploitation of this particular television production."

65.    Significantly, similar to each respective License Agreement, the Lincoln Agreement, in Section 2 entitled "Grant of Rights," includes the following express provision: "[a]ny and all licenses granted by Studio are **conditioned** upon Producer's compliance with and execution of this Video Licensing Agreement (the 'Agreement') and payment as required hereunder.  Any and all licenses granted hereunder and **rights to use** the content **shall terminate** upon failure to comply with **any provision** of this Licensing Agreement, or failure to make full payment or failure to credit Studio . . ."  (Emphasis supplied).

*Unlicensed Exploitation*

66.    Notwithstanding the clear and unambiguous terms of the Lincoln Agreement in relation to this limited scope of any agreed-upon license, Defendant Left/Right, by and through A&E, exploited materials licensed in the Lincoln Agreement in the wholly separate production the Real Face of Jesus Program.

67.    Specifically, Defendants Left/Right and A&E, without any permission, exploited unlicensed Emmy Award winning materials that Plaintiff Studio Macbeth wholly-owned and created, including graphic animation materials of the Virtual Lincoln, at various occasions in the Real Face of Jesus Program.

68.    Notably, the Real Face of Jesus Agreement does not grant Defendants any license or right to use and/or exploit any graphic animation materials of the Virtual Lincoln for use in

the Real Face of Jesus Program.

69.    As such, Defendants' intentional and unauthorized exploitation of Plaintiff Studio Macbeth's graphic animation sequences outside the scope of the Lincoln Agreement constituted a clear breach of the Lincoln Agreement.

70.    Accordingly, as set forth in Section 2 of the Lincoln Agreement, Defendants' licenses and rights to use the content of Plaintiffs' graphic animation materials, specifically, the Virtual Lincoln, with respect to the Lincoln Program, terminated upon their failure to comply with the provisions of the Lincoln Agreement.

*Credits*

71.    In addition to these unlicensed exploitations of Studio Macbeth's graphic animation materials, pursuant to the terms of the Lincoln Agreement, specifically Paragraph 3 entitled "Restrictions," Left/Right was strictly prohibited from falsely representing itself, or causing any related entity to so represent itself, as the original creator of the licensed graphic animation materials, including, without limitation, the Virtual Lincoln.

72.    In direct contravention and in derogation of this explicit understanding, Left/Right has, and continues to display licensed graphic animation materials (and unlicensed graphic animation materials) on Left/Right's Website, which Website credits all materials therewith as its own and knowingly fails to provide any credit whatsoever to Studio Macbeth, the original creator and owner of the graphic animation materials, including, without limitation, the Virtual Lincoln.

73.    Moreover, Left/Right's director of the Lincoln Program wrongfully credits the Lincoln Program itself as the recipient of an Emmy Award when, in reality, Plaintiff Downing, in his individual capacity, was awarded an Emmy for his "Outstanding Individual Achievement

1    in a Craft: Graphic Design and Art Direction" stemming from Studio Macbeth's creation of the

2    Virtual Lincoln.

3

*Real Face of Jesus Agreement*

4         74.    The Real Face of Jesus Agreement explicitly provides that "[a]ll terms in this

5    Video Licensing Agreement (the 'Licensing Agreement') refer only to these Materials and to

6    their inclusion only in this particular television Production and to the promotion and exploitation

7    of this particular television Production."

8

9         75.    The Real Face of Jesus Agreement, in the section entitled "Grant of Rights,"

10    likewise includes the following express provision: "[a]ny and all licenses granted by Studio are

11    **conditioned** upon Producer's compliance with and execution of this Licensing Agreement and

12    payment as required hereunder.  Any and all licenses granted hereunder and **rights to use** the

13    content **shall terminate** upon failure to comply with **any provision** of this Licensing Agreement,

14    or failure to make full payment or failure to credit Studio . . ." (Emphasis supplied).

15

*Unlicensed Exploitation*

16         76.    Notwithstanding the clear and unambiguous terms of the Real Face of Jesus

17    Agreement, which maintains similar stringent and clear restrictions as the Lincoln Agreement

18    limitations regarding the scope of any agreed-upon licenses, Left/Right, by and through

19    Defendant A&E, intentionally and willfully exploited materials licensed exclusively for the Real

20    Face of Jesus Program in the wholly separate production of the Lost 40 Days Program.

21         77.    There are numerous instances in the Lost 40 Days Program of Defendants'

22

23    unauthorized exploitation of graphic animation materials strictly and exclusively licensed for use

24    in the Real Face of Jesus Program.

25         78.    Specifically, among other graphic animation materials, Defendants Left/Right and

**Singh, Singh & Trauben, LLP**

A&E wrongfully used and misappropriated graphic animation sequences of the Virtual Jesus in a manner not authorized by Plaintiffs and/or in a manner that clearly exceeded the scope of Plaintiffs' authorization as clearly reflected in the Real Face of Jesus Agreement.

79.     In total, Defendants exploited a minimum of seven (7) graphic animation sequences licensed exclusively for inclusion in the Real Face of Jesus Program, without permission or compensation, in the Lost 40 Days Program.  These graphic animation sequences included, among others, graphic animation sequences entitled the "Tomb," "Crosses at Sunset," "Real Face of Jesus Revealed," "Still Shroud Negative," "Enhanced Blood," "Scan and Shroud Comparison" and "High Resolution Real Face of Jesus."

80.     While Defendants used several of these graphic animation sequences multiple times in the Lost 40 Days Program, Defendants used one particular graphic animation sequence, entitled the "Real Face of Jesus," licensed exclusively in connection with the Real Face of Jesus Program, at least thirteen (13) different times in the Lost 40 Days Program.

81.     In total, the Lost 40 Days Program features, at a minimum, twenty-three (23) separate and independent uses of these seven (7) distinct graphic animation sequences Plaintiff Studio Macbeth provided and licensed to Defendants strictly in connection with the Real Face of Jesus Program.

*Additional Materials Defendants Exploited*

82.     Additionally, notwithstanding the clear and unambiguous terms of the Real Face of Jesus Agreement, Defendant Left/Right, after receiving and fully-accepting the contracted ten (10) graphic animation sequences as outlined in Paragraph 7(a) of Exhibit "A" of the Real Face of Jesus Agreement, has failed and/or refused and continues to fail and/or refuse to remunerate Studio Macbeth for the additional graphic animation sequences requested, accepted and actually

Singh,
Singh &
Trauben,
LLP

exploited in the Real Face of Jesus Program.

83.     Specifically, while the Real Face of Jesus Agreement guaranteed compensation for a minimum of ten (10) graphic animation sequences owned by Studio Macbeth and delivered to Defendants, during the course of production of the Real Face of Jesus Program, Studio Macbeth actually provided Defendants, at their direct request, at a minimum, twenty-seven (27) distinct graphic animation sequences.

84.     Defendants accepted each of these twenty-seven (27) distinct graphic animation sequences comprised of Studio Macbeth's valuable licensed materials and thereafter incorporated and used each graphic animation sequence in the Real Face of Jesus Program.

85.     Despite Paragraph 7(a) of Exhibit "A" of the Real Face of Jesus Agreement and Defendants' ultimate exploitation of these twenty-seven (27) graphic animation sequences, Studio Macbeth was only compensated for the initial ten (10) graphic animation sequences in relation to the Real Face of Jesus Program.

86.     Section 7(b) of Exhibit "A" of the Real Face of Jesus Agreement expressly provides, in pertinent part, as follows: [i]n the event that Producer requests additional Materials in connection with the Program other than those set forth in paragraph 7(a) above, Studio and Producer agree that for each additional sequence of Materials requested by Producer and which conforms to the same specifications as set forth in paragraph 2(a) above, Producer shall pay Studio the all-inclusive sum of Ten Thousand Dollars ($10,000.00) for **each** such **additional sequence of Materials**, subject to the terms and conditions hereof.  (Emphasis supplied).

87.     As such, Defendants exploited, at a minimum, seventeen (17) distinct graphic animation sequences wholly-created and owned by Plaintiff Studio Macbeth without compensating Studio Macbeth whatsoever in accordance with the Real Face of Jesus Agreement.

*Credits*

88.     Moreover, Defendants Left/Right and A&E have also failed and/or refused to provide the recognition and credit associated with the materials Defendants licensed and used in connection with the Real Face of Jesus Agreement.

89.     Specifically, Defendant Left/Right, on multiple occasions, abdicated the contractual language clearly identifying Plaintiff Downing as a co-producer and instead represented itself, and continues to represent itself, as the sole producer for the Real Face of Jesus Program.

90.     Additionally, A&E's physical packaging of the Real Face of Jesus Program, while explicitly referencing and crediting Left/Right, omits any and all mention of Plaintiffs.

### The Lost 40 Days Agreement

91.     The Lost 40 Days Agreement, in the section entitled "Grant of Rights," also includes the following express provision: "[a]ny and all licenses granted by Studio are **conditioned** upon Producer's compliance with and execution of this Licensing Agreement and payment as required hereunder.  Any and all licenses granted hereunder and **rights to use** the content **shall terminate** upon failure to comply with **any provision** of this Licensing Agreement, or failure to make full payment or failure to credit Studio . . ." (Emphasis supplied).

92.     Initially, contrary to the terms of the Real Face of Jesus Agreement and the terms of the Lost 40 Days Agreement, Defendants have broadcasted or caused to have broadcasted the Real Face of Jesus Program and the Lost 40 Days Program on cable network channels other than the History Channel, including, without limitation, Defendant A&E's cable channel H2 (abbreviation for History 2), formerly History International.

93.     Upon information and belief, contrary to their respective Licensing Agreements,

Defendants have additionally broadcasted or caused to have broadcasted the Real Face of Jesus Program and the Lost 40 Days Program on international cable networks and/or channels not covered by the governing Licensing Agreements.

*Additional Materials Defendants Exploited*

94.     Regarding the Lost 40 Days Agreement, notwithstanding its clear and unambiguous terms, Left/Right, after receiving and fully accepting the contracted six (6) graphic animation sequences as outlined in the Lost 40 Days Agreement's Exhibit entitled "Schedule 1," has failed and/or refused and continues to fail and/or refuse to remunerate Studio Macbeth for the numerous additional graphic animation sequences Defendants requested, accepted and actually exploited in the Lost 40 Days Program.

95.     Specifically, pursuant to the Lost 40 Days Agreement, Defendants agreed to pay Plaintiff Studio Macbeth the all-inclusive sum of $120,000.00 for six (6) post-resurrection graphic animation sequences.

96.     Significantly, the Lost 40 Days Agreement expressly provides that in the event that Defendants request additional materials in connection with the Lost 40 Days Program other than the six (6) delineated graphic animation sequences, Defendants shall pay Plaintiff Studio Macbeth as set forth in paragraph 7(b) of the Lost 40 Days Agreement.

97.     Paragraph 7(b) of the Lost 40 Days Agreement provides that for each additional graphic animation sequence requested by Defendants, any and all costs associated therewith shall be subject to good faith negotiations between the parties with payment in full due upon delivery to and acceptance by Defendants.

98.     Similar to the exploitation of additional graphic animation sequences in the Real Face of Jesus Program, Defendants exploited a total of nineteen (19) graphic animation

sequences in connection with the Lost 40 Days Program, while, as set forth above, contracting and solely paying for the use of six (6) of these graphic animation sequences.

99.     As such, Defendants exploited, at a minimum, an additional thirteen (13) graphic animation sequences without compensating Plaintiff Studio Macbeth in any manner.

100.     Moreover, above and beyond the additional graphic animation sequences Defendants exploited in the Lost 40 Days Program, Defendants exploited, at a minimum, an additional nine (9) video sequences Plaintiffs' developed, created and delivered to Defendants for use in the Lost 40 Days Program, without compensating Plaintiff Studio Macbeth in any manner for this acceptance and use.

101.     Specifically, at Defendants' direct request and benefit, Plaintiff Downing wholly-developed and created nine separate video sequences, which video sequences Defendants exploited in connection with the Lost 40 Days Program.

102.     In addition to the fact that these graphic animation sequences and video sequences are readily-apparent within the Lost 40 Days Program itself, Defendant Left/Right's multiple requests for these additional materials and the exploitation thereof is corroborated and ratified by numerous electronic mail messages and communications wherein Defendant Left/Right expressly outlines the nature and extent of additional materials requested.

103.     It subsequently became clear that Defendants required these additional materials and graphic animation sequences based upon, among other reasons, their preconceived intent to not include the Scientific Elements, thereby requiring the inclusion of significant additional animation materials to fill the void in the program left by the production of an alternate undisclosed thematic agenda.

*Credits*

104.   Further, regarding the Lost 40 Days Program, notwithstanding the express contractual language, neither Plaintiffs Studio Macbeth nor Downing is properly credited pursuant to the Lost 40 Days Agreement.

105.   In particular, as with both the Lincoln Program and the Real Face of Jesus Program, Left/Right has, and continues to, display licensed materials (and unlicensed materials) with respect to the Lost 40 Days Program on Left/Right's Website without crediting Plaintiffs as either owners or producers.

106.   Significantly, all three License Agreements each contain a provision explicitly providing that "all licenses granted hereunder and rights to use the content shall terminate upon failure to comply with any provision of this agreement."

107.   As such, subsequent to Defendants' breaches of the operative License Agreements, neither Defendant Left/Right nor Defendant A&E was entitled to continue to avail themselves of any of the licenses granted consistent with the License Agreements.

*Misappropriation and Improper Use of Plaintiff Downing's Image and Likeness*

108.   Finally, notwithstanding that Plaintiff Downing negotiated and contracted for producer screen credit for the Lost 40 Days Program, Defendants Left/Right and A&E, through their effort to unilaterally and covertly promote a specific thematic agenda with the Lost 40 Days Program, misappropriated unlicensed footage of Plaintiff Downing from the Real Face of Jesus Program and, further, bisected these unlicensed scenes and injected them into the Lost 40 Days Program.

109.   Specifically, Plaintiff Downing was at all times under the belief that the Lost 40 Days Program was a scientific inquiry guided by modern-day physics, historical analysis, and

Singh, Singh & Trauben, LLP

archaeological discoveries into the post-resurrection accounts found in the New Testament, which belief was further purposefully fostered and nurtured by Defendants.

110.    By meticulously bisecting scenes featuring Plaintiff Downing personally licensed exclusively for the Real Face of Jesus Program and combining them with scenes from the Lost 40 Days Program, in addition to scenes of religious individuals interviewed by Defendants, Defendants were able to manufacture an image and representation of Plaintiff Downing which appears to share the purely religious themes and conclusions of the altered program.

111.    In particular, while any and all religious elements of Plaintiff Downing's interviews and speech remain in the Lost 40 Days Program, including unlicensed and out-of-context footage of Plaintiff Downing from the Real Face of Jesus Program, which footage is duly amplified, any scientific inquiries and discussions were completely removed from the Lost 40 Days Program.

112.    As such, Defendants Left/Right and A&E's severe and unilateral modifications of the original Lost 40 Days Program's scientific concepts cultivated by Plaintiff Downing, in addition to sliced footage of Downing himself, inappropriately associate Downing with programming and viewpoints he neither authorizes nor endorses.

113.    Defendants' actions regarding these unilateral modifications were performed purposefully and knowingly.

114.    Additionally, at all times, these unilateral modifications were performed without Plaintiff Downing's knowledge, awareness and certainly without his consent.

115.    In particular, despite Plaintiff Downing's status as a producer on the Lost 40 Days Program, Defendants prevented Plaintiff Downing from acting in his prescribed role as producer and purposefully circumscribed and limited his access to view materials during production,

Singh,
Singh &
Trauben,
LLP

instead shielding him from the actual thematic trajectory of the production for the purpose of continuing to be able to request and obtain additional graphic animation sequences and video materials.

116.    Defendants purposefully shielded Plaintiff Downing from such access so as to knowingly deceive Downing as to the direction of the production of materials against the purpose Plaintiff Downing intended for these materials.

### *The Copyright Registrations*

117.    Plaintiff Studio Macbeth has properly filed and registered its wholly-developed and created audio-visual materials with the Federal Copyright Office.

118.    Specifically, Plaintiff Studio Macbeth has registered the original audio-visual work of the Virtual Lincoln, obtaining in receipt thereof the Case No. 1-703498951.

119.    Additionally, Plaintiff Studio Macbeth has registered the original audio-visual work of the Virtual Jesus, obtaining in receipt thereof the Case No. 1-703499170.

120.    Finally, Plaintiff Studio Macbeth has registered the original audio-visual work of the Jesus Animation, obtaining in receipt thereof the Case No. 1-703499192.

121.    Thereafter, Plaintiff Studio Macbeth registered further original audio-visual work associated with the Virtual Jesus, obtaining in receipt thereof the Case No. 1-757755532.

122.    Additionally, Plaintiff Studio Macbeth registered further original audio-visual work associated with the Jesus Animation, obtaining in receipt thereof the Case No. 1-757755532.

123.    All conditions precedent to the institution of this action have been satisfied, discharged, excused, and/or waived.

**COUNT I**
**COPYRIGHT INFRINGEMENT (17 U.S.C. §§ 501, *et seq.*)**
**(As Against All Defendants)**

124.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 123 as if fully set forth herein.

125.    As alleged hereinabove, Defendants have willfully infringed upon Plaintiff Studio Macbeth's copyrights in the subject virtual audio-visual works and graphic animation sequences, including, but not limited to, the graphic animation sequences associated with the Virtual Lincoln, the Virtual Jesus and the Jesus Animations (collectively the "Virtual Works") with the intent to commercially exploit these Virtual Works to which they maintain no legal or propriety rights.

126.    Defendants, including A&E by and through the History Channel, have willfully infringed Plaintiff Studio Macbeth's copyrights by using Plaintiff's works and materials in a manner not authorized by Plaintiff and/or in a manner that exceeded the scope of Plaintiff's authorization, i.e. exploiting the Virtual Works in wholly separate and unauthorized programs and broadcasting these programs outside of the History Channel.  Based thereon, Defendants' use of the Virtual Works and copyrightable materials exceeds the scope of the License Agreements, any consent to use same and constitutes an infringement of Plaintiff Studio Macbeth's rights.

127.    As the owner and creator of the Virtual Works, Plaintiff Studio Macbeth is entitled to exclusive use of the Virtual Works without the unauthorized use by third parties.

128.    Plaintiff Studio Macbeth never granted Defendants a license to reproduce, distribute, publicly perform, or in any way use, compile, or commercially exploit its Virtual Lincoln outside of the Lincoln Program.

129.    By reproducing, distributing and publically displaying Studio Macbeth's Virtual

Singh, Singh & Trauben, LLP

Lincoln outside the scope of the Lincoln Program, Defendants have violated Studio Macbeth's copyright for the purpose of their own financial gain.

130.    Plaintiff Studio Macbeth never granted Defendants a license to reproduce, distribute, publicly perform, or in any way use, compile, or commercially exploit its Virtual Jesus outside of the Real Face of Jesus Program.

131.    By reproducing, distributing and publically displaying Studio Macbeth's Virtual Jesus outside the scope of the Real Face of Jesus Program, Defendants have violated Studio Macbeth's copyright for the purpose of their own financial gain.

132.    Plaintiff Studio Macbeth has received no compensation in connection with Defendants' unauthorized exploitation of the Virtual Works, including Defendants' misappropriation and unauthorized use of Plaintiff Studio Macbeth's Virtual Lincoln and Virtual Jesus.

133.    Upon information and belief, all Defendants have profited significantly from and in connection with the unauthorized sale and exploitation of the programming containing unauthorized uses of the Virtual Works.

134.    All three License Agreements each contain a provision explicitly providing that "all licenses granted hereunder and rights to use the content shall terminate upon failure to comply with any provision of this agreement."

135.    Accordingly, all licenses Studio Macbeth granted to Defendants Left/Right and A&E in connection with Lincoln Agreement, the Real Face of Jesus Agreement, and the Lost 40 Days Agreement have now terminated, rendering all of Defendant A&E's continuing and prolific use without authorization or license.

136.    Plaintiff Studio Macbeth is entitled to an injunction enjoining Defendants and

their agents, employees, and all other persons in active concert or privity or in participation with them, from directly or indirectly infringing on Plaintiff Studio Macbeth's copyrights in the Virtual Works or from continuing to market, offer, sell, dispose of, license, lease, transfer, display, advertise, reproduce, develop, or manufacture any works derived and/or copied from the Virtual Works, in whatever medium, or to participate or assist in any such activity.

137.    Defendants' conduct, including their infringement, has been, and continues to be, willful and with full knowledge and reckless disregard for Plaintiff Studio Macbeth's copyrights.

138.    Indeed, notwithstanding being put on notice of Plaintiff Studio Macbeth's claims, Defendants have failed and/or refused to act to remedy the infringement, and History Channel programming containing the unauthorized use of the Virtual Works continues to be sold, distributed and exploited for substantial gain.

139.    By reason of these willful infringements, Plaintiff has sustained injury, loss and damage to their ownership rights and Defendants have unlawfully, unfairly and wrongfully derived and will continue to derive income from these infringing acts.  Defendants are being unjustly enriched by their infringement.

140.    Defendants continue to infringe upon Plaintiff's copyrights, causing Plaintiff irreparable injury and damage.  Said infringement entitles Plaintiff to actual damages, injunctive and other relief provided by the Copyright Act in an amount to be determined at trial.

**COUNT II**
**BREACH OF LICENSE AGREEMENTS**
**(As Against all Defendants)**

141.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 123 as if fully set forth herein.

142.    Pursuant to the Lincoln Agreement, Plaintiff Studio Macbeth granted a limited license to Defendant Left/Right to use a set number of certain graphic animation sequences of

1    the Virtual Lincoln for inclusion within a History Channel production to be aired on the History

2    Channel alone.

3       143.  In accordance with the express terms of the Lincoln Agreement, Defendant

4    Left/Right's contractual right to exploit these nine (9) graphic animation sequences developed by

5    Studio Macbeth was unequivocally limited to the production of the Lincoln Program on the

6    History Channel.

7       144.  Specifically, pursuant to Paragraph 2 of the Lincoln Agreement, all rights Studio

8    Macbeth granted to Defendants regarding the Virtual Lincoln were expressly non-transferable,

9    non-sublicensable and related solely to the Lincoln Program on the History Channel.

10

11      145.  Notwithstanding these clear contractual restrictions and limited scope of

12   Defendants' license to exploit Plaintiffs' Virtual Lincoln creation, Defendants proceeded to

13   nonetheless purposefully exceed the scope of, breach, and continue to breach, the terms of the

14   Lincoln Agreement by exploiting copyrighted materials licensed exclusively in connection with

15   the Lincoln Program on another History Channel production and outside the History Channel.

16      146.  Specifically, Defendants exploited materials licensed in the Lincoln Agreement in

17   the wholly separate production of the Real Face of Jesus Program.

18      147.  Repeating this course of conduct, pursuant to the Real Face of Jesus Agreement,

19   Plaintiff Studio Macbeth provided Defendant Left/Right with a limited license to use and exploit

20   the Virtual Jesus animations Plaintiff Studio Macbeth created and owns.

21

22      148.  Notwithstanding the clear and unambiguous terms of the Real Face of Jesus

23   Agreement, which maintains similar stringent and clear restrictions as the Lincoln Agreement

24   limitations regarding the scope of any agreed-upon licenses, Defendants intentionally and

25   willfully exploited materials licensed exclusively for the Real Face of Jesus Agreement in the

Singh,
Singh &
Trauben,
LLP

wholly separate History Channel production of the Lost 40 Days Program in addition to broadcasting, or causing to have broadcasted this program outside of the History Channel.

149.    In addition, pursuant to the terms of Real Face of Jesus Agreement, in the event that Defendant Left/Right requested additional materials above and beyond those specifically delineated in the Real Face of Jesus Agreement, then Defendant Left/Right would accordingly be required to compensate Plaintiffs the all-Inclusive sum of Ten Thousand Dollars ($10,000.00) for each such additional sequence requested.

150.    Notwithstanding the clear and unambiguous terms of the Real Face of Jesus Agreement, Defendants, after receiving and fully-accepting the contracted ten (10) sequences as outlined in Paragraph 7(a) of the Real Face of Jesus Agreement's Exhibit "A," have failed and/or refused and continue to fail and/or refuse to remunerate Studio Macbeth for the several additional sequences requested, accepted and actually exploited in the Real Face of Jesus Program.

151.    Similarly, pursuant to the terms of the Lost 40 Days Agreement, in the event that Left/Right required and/or requested additional graphic animation materials of the Jesus Animations beyond those specifically referenced in the attached "Schedule 1," Left/Right would compensate Studio Macbeth a mutually agreed-upon fee, including any and all costs associated therewith upon delivery.

152.    Notwithstanding its clear and unambiguous terms, Defendants, after receiving and fully-accepting the contracted six (6) sequences featuring the Jesus Animation as outlined in the Lost 40 Days Agreement's attached Exhibit "Schedule 1," have failed and/or refused and continue to fail and/or refuse to remunerate Studio Macbeth for the numerous additional graphic animation and video materials of the Jesus Animations requested, accepted and actually

exploited in the Lost 40 Days Program.

153.    Plaintiffs have been significantly harmed by Defendants' breaches of the License Agreements based upon, among other things, Defendants' failure and/or refusal and continued failure and/or refusal to compensate Plaintiffs agreed-upon sums for use of Plaintiffs' graphic animation materials of the Jesus Animations.

154.    Additionally, Defendant Left/Right has breached the License Agreements by displaying and exploiting the respective licensed materials on, among other places, Defendant Left/Right's Website, which Website credits all materials therewith as its own and knowingly fails to provide any credit whatsoever to Studio Macbeth, the original creator and owner of the materials.

155.    Plaintiffs have performed all their obligations under the License Agreements.

156.    As a direct and proximate result of Defendants' multiple breaches of the subject License Agreements, Plaintiffs have suffered significant and extensive damages and economic losses in an amount to be determined at trial.

**COUNT III**
**UNJUST ENRICHMENT**
**(*In the Alternative* - As Against all Defendants)**

157.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 123 as if fully set forth herein.

158.    In or around June 2009, Defendant Left/Right entered into the Real Face of Jesus Agreement with both Plaintiffs Macbeth and Downing for the purposes of, among other things, obtaining the license rights to the specifically-identifiable and valuable Virtual Jesus materials.

159.    Pursuant to the terms of Real Face of Jesus Agreement, in the event that Defendants requested additional materials above and beyond those specifically delineated in the Real Face of Jesus Agreement, then Defendants would accordingly be required to compensate

Plaintiffs the all-inclusive sum of Ten Thousand Dollars ($10,000.00) for each such additional sequence requested.

160.    Notwithstanding the clear and unambiguous terms of the Real Face of Jesus Agreement, Defendants, after receiving and fully-accepting the contracted ten (10) sequences as outlined in Paragraph 7(a) of the Real Face of Jesus Agreement's Exhibit "A," have failed and/or refused and continue to fail and/or refuse to remunerate Studio Macbeth for the numerous additional sequences requested, accepted and actually exploited in the Real Face of Jesus Program.

161.    Further, in or around September 2010, Defendant Left/Right entered into the Lost 40 Days Agreement with both Plaintiffs Studio Macbeth and Downing for the purposes of, among other things, obtaining the license rights to the specifically-identifiable and valuable Jesus Animation materials.

162.    Pursuant to the terms of the Lost 40 Days Agreement, in the event that Defendants required and/or requested additional materials beyond those specifically referenced in the attached "Schedule 1", Defendants would compensate Studio Macbeth a mutually agreed-upon fee, including any and all costs associated therewith upon delivery.

163.    Notwithstanding its clear and unambiguous terms, Defendants, after receiving and fully-accepting the contracted six (6) sequences as outlined in the Lost 40 Days Agreement's attached Exhibit "Schedule 1", have failed and/or refused and continue to fail and/or refuse to remunerate Studio Macbeth for the numerous additional sequences requested, accepted and actually exploited in the Lost 40 Days Program.

164.    Defendants knowingly received the benefit of Plaintiff Studio Macbeth's numerous additional sequences.

Singh,
Singh &
Trauben,
LLP

165.     Plaintiff Studio Macbeth and Downing conferred these significant benefits upon Defendants in good-faith and with the reasonable expectation that Plaintiff would be paid for these valuable services and materials.

166.     Defendants' failure to pay Plaintiffs for the value of these services and materials has caused substantial damages to Plaintiffs.

167.     Additionally, Defendants have failed to compensate Plaintiffs for unlicensed usage of Plaintiff's materials outside of the History Channel.

168.     Moreover, Defendants have received and obtained substantial gains, advantages, and benefits by creating the false impression that they are the owners and authors of the Virtual Works.

169.     It is inequitable and unjust for Defendants to retain those gains, advantages, and benefits.

170.     Defendants have enriched themselves at the expense and to the detriment of Plaintiffs.

171.     As a result of the retention of such benefits, Defendants have been unjustly enriched and are jointly and severally liable to Plaintiffs.

172.     Plaintiffs are entitled to receive and obtain from Defendants the reasonable value of the revenues derived from History Channel's programming containing and using the Virtual Works, including the Virtual Jesus and Jesus Animations.

173.     As a result of the unjust enrichment of Defendants, Plaintiffs have suffered significant and extensive damages and economic losses in an amount to be determined at trial.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (As Against All Defendants)

174.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 thru 123 as if fully set forth herein.

175.    A covenant of good faith and fair dealing is implied in every contract, including the License Agreements between Plaintiffs and Defendants.

176.    Through their wrongful conduct as alleged above, Defendants have breached the covenant by attempting to deprive and actually depriving Plaintiffs of the benefits of the License Agreements.  In particular, by engaging in the acts as alleged, Defendants Left/Right and A&E have taken overt and covert steps to impair or disrupt Plaintiffs' exclusive rights in and to their Virtual Works, including improperly crediting Plaintiffs in connection with the continued and prolific use and exploitation of the Virtual Works.

177.    By and through these aforementioned acts and omissions, Defendants have acted capriciously to contravene and completely frustrate the reasonable expectations of Plaintiffs, have eviscerated the spirit of the License Agreements, have willfully and materially breached material provisions of the License Agreements and have further deprived Plaintiffs of the benefits of the License Agreements, all in direct violation of its obligation of good faith in performance.

178.    As a direct and proximate result of Defendants' bad-faith acts and omissions, Plaintiffs have suffered significant and extensive damages and economic losses in an amount to be determined at trial.

## COUNT V
## ACCOUNTING
### (As Against All Defendants)

179.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 thru 123 as if fully set forth herein.

Singh,
Singh &
Trauben,
LLP

PLAINTIFFS RAYMOND DOWNING AND STUDIO MACBETH'S COMPLAINT - 32

180.     Upon information and belief, Defendants received, and continue to receive, substantial revenues from the sale of and contracts related to the infringing History Channel programming containing, using and exploiting the copyrighted Virtual Works or unauthorized derivatives thereof.

181.     Accordingly, Plaintiffs are entitled to a full accounting of all revenues received by Defendants in connection with the creation, marketing, broadcasting, distribution and sale of the infringing History Channel programming containing and using the copyrighted Virtual Works or unauthorized derivatives thereof.

182.     Additionally, Plaintiffs are entitled to a specific accounting in connection with all infringing broadcasting of these programs outside the History Channel itself, both nationally and internationally.

**COUNT VI**
**VIOLATION OF N.Y. CIV. RIGHTS LAWS §50 and §51**
**(As Against All Defendants)**

183.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 123 as if fully set forth herein.

184.     Defendants' knowing and intentional use, display, advertisement, reproduction and publishing of Plaintiff Downing's image, likeness and voice has been, is and continues to be a violation of N.Y Civ. Rights Law Section 50, and Plaintiff is entitled to damages pursuant to N.Y Civ. Rights Law Section 51.

185.     As set forth above, Defendants, without permission, exploited video footage and interviews of Plaintiffs Downing licensed strictly in connection with the Real Face of Jesus Program in the Lost 40 Days Program.

186.     Specifically, notwithstanding that Plaintiff Downing negotiated and contracted for producer screen credit for the Lost 40 Days Program, Defendants Left/Right and A&E, through

their effort to unilaterally and covertly promote a specific thematic agenda with the Lost 40 Days Program, misappropriated unlicensed footage of Plaintiff Downing from the Real Face of Jesus Program and, further, bisected these unlicensed scenes and injected them in completely misplaced context into the Lost 40 Days Program.

187.   At no time prior to commencement of the unauthorized use of Plaintiff Downing's image and likeness did Defendants advise Plaintiff that they intended to, would or in fact were using his images in said manner, nor did Defendants obtain the consent of Plaintiff Downing in the manner so required.  The consent of Plaintiff was, and is, required for all such uses.

188.   New York Civil Rights Law, Sections 50 and 51, specifically proscribe the use of an individual's name, portrait or picture for trade, commercial or advertising use without the written consent of the individual.  These Statutes specifically provide, among other things, that compensatory and punitive damages are recoverable for violations of the statutes, as well as injunctive relief and attorneys' fees.

189.   There exists a strong public policy against this precise unauthorized use of an individual's name, portrait, voice and picture for commercial or advertising purposes without written consent.

190.   Plaintiff Downing is entitled to compensation for the use of his image, likeness and voice, both for the period of use prior to the filing of this Complaint and so long as Defendants continue to use Plaintiff Downing's image hereafter.

191.   In wrongfully exploiting Plaintiff Downing's image, likeness and voice for trade without his permissions, Defendants have damaged and are continuing to cause damage to Downing by, among other things, distorting and trivializing Plaintiff's image, likeness and voice, thus diminishing its value for future licensing.

Singh,
Singh &
Trauben,
LLP

192.     Defendants did not engage in the above-described wrongful actions out of any sincere or proper motive, but did so knowingly, willfully and oppressively, intending to appropriate to themselves without compensation what they knew to be Plaintiff Downing's valuable rights.  Said misconduct was also fraudulent, in that the public was led to believe falsely that Downing consented to such commercial use of Downing's image, likeness and voice, and was associated with and approved of the Lost 40 Days Program and its altered themes and agenda.

193.     Defendants have earned substantial gross revenue stemming from the broadcasting of the subject programs in conjunction with the use of Plaintiff's image, likeness and voice without authorization and consent, which specific amount is yet to be determined.

194.     The conduct and actions of the Defendants have been willful, wrongful, intentional, and without any right or entitlement whatsoever, and accordingly Plaintiff Downing is entitled to punitive damages stemming from this reckless disregard of Plaintiff's rights to his own image, likeness and voice.

195.     Plaintiff Downing is entitled to recover from the Defendants the revenues derived from the unauthorized uses of Plaintiff Downing's image, likeness and voice through any other mediums that are presently unknown to Plaintiff Downing at this time.

196.     As a direct and proximate result of the aforesaid wrongful acts of Defendants, and each of them, Plaintiff Downing has been damaged in an amount that is not yet fully ascertainable, but which exceeds the jurisdictional minimum of this Court.

### COUNT VII
### FRAUD IN THE INDUCEMENT
#### (As Against All Defendants)

197.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1

through 123 as if fully set forth herein.

198.    Defendants, to induce Plaintiffs' agreement to license Plaintiff Studio Macbeth's original and valuable graphic animation and video sequences of the Jesus Animations for exploitation in the Lost 40 Days Program, made material false representations and assurances to Plaintiffs, which representations were further entrenched and encompassed in the official written Prospectus.

199.    Specifically, Defendant A&E, by and through Lindahl, and Defendant Left/Right, by and through Druckerman and Marks, represented that the Lost 40 Days Program would be a critical, historical, and scientific investigation into the events described in the New Testament's post resurrection accounts.

200.    Based upon Defendants' material representations and promises, Plaintiffs agreed to enter into the Lost 40 Days Agreement and, in connection therewith, provide the valuable Jesus Animations to Defendants.

201.    Defendants A&E and Left/Right knew that at all times Plaintiffs were relying upon Defendants' material and knowingly false representations, including the written Prospectus, in agreeing to enter into the Lost 40 Days Agreement and provide the valuable Jesus Animations to Defendants.

202.    At the time Defendants A&E and Left/Right made the foregoing material misrepresentations and promises to Plaintiffs, Defendants A&E and Left/Right had no intention of acting upon the specific promises and representations as set forth in the Prospectus, and further knew that such representations were false when made.

203.    Notwithstanding that the Scientific Elements, historical content and Physicist interviews were explicitly outlined in the Prospectus, Defendants A&E and Left/Right never

Singh,
Singh &
Trauben,
LLP

allocated any funding for the development of such materials, which included, without limitation, scientific or historical experts, on-camera scientific experiments, scientific reenactments, and scientific graphics.

204.    Moreover, scientific experiments funded exclusively by Plaintiffs were explicitly excluded from the Lost 40 Days Program, in addition to an interview of a physicist personally recruited by Plaintiff Downing.

205.    Rather than resulting in a critical, historical, and scientific investigation into the events described in the New Testament's post resurrection accounts, the Lost 40 Days Program culminated in a purely religious exposition into these matters.

206.    Defendants A&E and Left/Right purposefully made such false material representations to knowingly deceive Plaintiffs regarding the direction of the Lost 40 Day Program, including specifically, the exploitation of Plaintiffs' Jesus Animation materials.

207.    At all times, Plaintiffs acted in justifiable reliance upon Defendants A&E and Left/Right's material misrepresentations and assurances as, at the time Defendants A&E and Left/Right made such representations, Plaintiffs were not aware of Defendants' complete lack of intention to adhere to their representations and the Prospectus, and Plaintiff could not, in the exercise of reasonable diligence, have discovered Defendants' affirmative intention of not performing.

208.    As a direct and proximate result of Plaintiffs' justifiable reliance upon Defendants' fraudulent misrepresentations, Plaintiffs have suffered significant and extensive damages and significant harm to Plaintiffs' professional reputation in an amount to be proven at trial.

Singh, Singh & Trauben, LLP

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs Raymond Downing and Studio Macbeth, Inc. respectfully request that this Court enter a final judgment in their favor and as against Defendants Left Right, Inc. and A&E Television Networks, LLC, jointly and severally, as follows:

(i)    Determining that Defendants have infringed on Plaintiff Studio Macbeth's copyrights in the Virtual Works;

(ii)    That pursuant to federal law, the Court issue preliminary and permanent injunctive relief against Defendants, and that Defendants, their officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with him, be enjoined and restrained, during the pendency of this action and permanently, from:

    a.    assembling, producing, acquiring, distributing, offering for distribution, circulating, selling, offering for sale, advertising, importing, promoting, or displaying any reference, or otherwise evidence that Defendants have assembled, produced, acquired, distributed, offered for distribution, circulated, sold, offered for sale, imported, advertised, promoted, or displayed counterfeit software and/or components that incorporate or include any of Studio Macbeth's copyrighted materials, or any other simulation, copy, colorable imitation, or counterfeit of Studio Macbeth's copyrighted materials;

    b.    engaging in any other activity constituting an infringement of any of Studio Macbeth's copyrights, or of Studio Macbeth's rights in, or right to use or to exploit these copyrights; and

    c.    assisting, aiding, or abetting any other person or entity in engaging in or performing any of the activities referred to above.

(iii)    That Defendants, and their agents, employees, and all other persons in active concert or privity or in participation with them, be enjoined from directly or indirectly infringing on Plaintiff Studio Macbeth's copyrights in the subject Virtual Works or from continuing to market, offer, sell, dispose of, license, lease, transfer, display, advertise, reproduce, develop, or manufacture any works derived and/or copied from the subject Virtual Works, in whatever medium, or to participate or assist in any such activity;

(iv)    That Defendants, and all their representatives, agents, servants, employees, officers, directors, partners, attorneys, subsidiaries, and all persons under their control or acting in active concert or participation with them, be ordered to immediately post a notice on each of its respective websites stating that the prior use of the subject Virtual Works was unauthorized;

(v)     That Defendants, their affiliates and licensees, immediately cease and desist from any further display, exploitation, reproduction, distribution, transmission, or other use of the Virtual Works;

(vi)    That Defendants, their affiliates and licensees, immediately sign over and deliver to Plaintiff Studio Macbeth any and all footage and or audio-visual materials containing any footage of Plaintiff Downing and his staff and premises, all screen grabs of Plaintiff Studio Macbeth's work, all interviews of third parties and the rights to those interviews which were instigated by Plaintiff Downing, and/or the result of the conceptual structure of these programs created by Plaintiff Downing, and all film footage created in Colorado including, but not limited to, interviews with Shroud experts;

(vii)   That judgment be entered in favor of Plaintiffs and against Defendants for the actual damages suffered by Plaintiffs and for any profits attributable to the infringements of Plaintiff Studio Macbeth's copyrights in the Virtual Works, the amount of which, at present, cannot be fully ascertained and that all gains, profits, and advantages derived by Defendants from their acts of infringement and other violations of law be deemed to be held in constructive trust for the benefit of Plaintiffs;

(viii)  That judgment be entered in favor of Plaintiffs and against Defendants for the damages suffered by Plaintiffs as a result of Defendants' numerous breaches of the subject License Agreements and that Plaintiffs be awarded all actual and compensatory damages suffered from these breaches in an amount to be determined at trial, plus interest and costs;

(ix)    That judgment be entered in favor of Plaintiffs and against Defendants for the damages suffered by Plaintiffs as a result of Defendants' breaches of the implied covenant of good faith and fair dealing in connection with the subject License Agreements and for Defendants' unjust enrichment;

(x)     That judgment be entered in favor of Plaintiffs and against Defendants for the actual damages suffered by Plaintiffs and for any profits attributable to Defendant's unauthorized use of Plaintiff Downing's name and likeness;

(xi)    That Defendants be ordered to furnish to Plaintiffs a complete and accurate accounting of all gross and net revenues and profits earned in connection with their use of the subject Virtual Works; and

(xii)   That the Court grant such other and further relief as this Court deems just, proper, and equitable under the circumstances.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues in this action so triable.

1  **DATED:** July 12, 2012
   Los Angeles, California

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Respectfully submitted,

**SINGH, SINGH & TRAUBEN, LLP**
**MICHAEL TRAUBEN**

By _____
       Michael Trauben

*Attorneys for Plaintiffs*
Raymond Downing and Studio Macbeth, Inc.

EXHIBIT "A"

## Video Licensing Agreement

### 1. Mutual Understandings and Context of Agreement.

Both parties are given to understand that:
Left/Right (Producer) is engaged in the production of a television program currently entitled "Stealing Lincoln's Body" (Production) for the History Channel.
Producer wishes to purchase a license from Studio Macbeth (Studio) for nine video clips (the "Materials") as listed in exhibit A for the inclusion within the Production.
Studio is the creator and owner of these Materials and has the right to grant such a license. Studio is willing to do so under the terms listed herein.
Producer is currently in possession of the Materials referred to herein and has found them suitable for inclusion in the Production as delivered.
Producer has conferred with the History Channel and represents that they have reviewed the work and desire to license it for inclusion as delivered.
All the terms in this agreement refer only to these Materials and to their inclusion only in this particular television production and to the promotion and exploitation of this particular television production.

### 2. Grant of Rights. Subject to the terms of this agreement:

Any and all licenses granted by Studio are conditioned upon Producer's compliance with and execution of this Video Licensing Agreement (the "Agreement") and payment as required hereunder. Any and all licenses granted hereunder and rights to use the content shall terminate upon failure to comply with any provision of this agreement, or failure to make full payment or failure to credit Studio (provided that the casual or inadvertent failure to provide such credit shall be not considered a breach of this Agreement giving rise to such termination right, and upon Producer's receipt of written notice by Studio of such failure to accord credit, Producer shall use reasonable business efforts to cure such failure on a prospective basis).
Studio shall be entitled to recover damages in an action at law but shall not be entitled to restrict or interfere with Producer's right to produce, distribute or exploit the Production. Studio grants to Producer exclusive and / or non-exclusive rights as per Exhibit A. These rights are non-transferable, non-sublicenseable, and relate only to this particular Production. Studio is aware that the Production itself is being created for use by the History Channel and this License is specific to that usage alone.  Producer has the right but not the duty to use, adapt, edit, add to, subtract from, overdub, revise or alter the Materials as needed in connection with the advertising, promotion, publicity and exploitation of the Program, in any and all media or formats now or hereafter known, throughout the universe, in perpetuity, without additional compensation to Studio.

### 3. Restrictions.

Licensee (Producer) may not sublicense, sell, assign, convey, or transfer this agreement or any of its rights under this agreement. The sole exception being the History Channel (and it successors and assigns) as the acknowledged end user of these Materials. Licensee may not make the licensed Materials available (separate from the end product into which it is incorporated) to any unauthorized users.
Licensee may not distribute any product containing the licensed Materials in a way that is intended to allow or invite a third party to download or extract the licensed material as a stand alone file.

The Licensee may not falsely represent that the Licensee is the original creator of the work it has licensed.

If the licensed Materials are reproduced in any derivative work based on the Production and which contains other screen credits, it must also include a credit to Studio. Producer must afford Studio a credit, on a separate card, in the end credit roll of the Production, provided that Studio has signed this Agreement, is not in material default of this Agreement, and the Production is actually broadcast. No casual or inadvertent failure to comply with the credit or billing requirements shall be deemed a breach of this Agreement (provided that upon Producer's receipt of written notice by Studio of such failure to accord credit, Producer shall use reasonable business efforts to cure such failure on a prospective basis), and the sole remedy for breach of any of the billing provisions of this Agreement shall be an action at law for damages, it being agreed that in no event shall Studio seek or be entitled to injunctive relief for breach of any of the credit of billing requirements hereof, nor shall Studio be entitled to terminate this Agreement. Except as otherwise specified herein, the form, size, placement and appearance of the credit accorded to Studio under this Agreement shall be determined by Producer in its sole discretion.

## 4. Copyright, Ownership and Intellectual Property.

No ownership or copyright in any licensed material shall pass to the Licensee by issuance of the license contained in this agreement. Issuance of this license does not constitute rights, title, or interest in any of the intellectual, digital, software, or physical resources utilized in the creation of the Materials. Similarly, inclusion of any licensed Materials in the Production shall not be deemed to transfer any ownership, copyright or any other intellectual property rights in the Production to the Studio.

## 5. Warranty and Limitation of Liability.

Studio warrants that it has the necessary rights and authority to enter into and perform this agreement.

It is stipulated by Studio that none of the archival materials which underlie any of the video clips delivered have been secured by Studio. All such materials are deemed furnished by Producer and rights and clearances remain the responsibility of Producer. Specifically, licenses to the following photographs are not included in this agreement, nor does Studio claim any rights to convey such licenses: Lincoln lying in state in City Hall, New York; Teddy Roosevelt as a child in New York City building during Lincoln funeral procession; Teddy Roosevelt and Elliott Roosevelt, Fords Theater, Abraham Lincoln and Mrs. Lincoln, and John Wilkes Booth.

Studio represents that the embellishments, dimensionalizations, and animations of these archival materials are all original to Studio, and this new informational content is Studio's to license subject to procurement of a license to the underlying imagery by Producer.

The following video clips: Abe Mourns Willie, Lincoln on Stairs, Lincoln Falling Over, Lincoln Slumped in Chair, and Lincoln Walking Down Street, are original to Studio and will not infringe on any copyright or intellectual property right of any third party.

Studio does not indemnify Producer from the consequences of not procuring proper rights and clearances on underlying materials.

## 6. Mutual Indemnification.

Provided that licensed materials are used in accordance with this agreement and that the Licensee is not in breach of this agreement, Studio shall defend and indemnify the Licensee arising out of any breach of Studio's warranty.

Licensee shall defend and indemnify and hold harmless Studio from all damages, liabilities, and expenses arising out of claims by third parties relating to unauthorized use of underlying materials in the license to video clips.

The party seeking indemnification pursuant to section 6 shall promptly notify the other party of such claim.

**7. Terms.** Subject to the execution of this Agreement by Studio, all payments due by January 17th, 2009.

Per item costs of video clips are as follows:

(a) Coffin Video. Producer shall pay Studio the aggregate sum of Six Thousand Dollars ($6,000). Received to date:  $3,000.

(b) Funeral Procession (aka Teddy Roosevelt). Producer shall pay Studio the aggregate sum of Four Thousand Dollars ($4,000). Received to date:  $2,000.

(c) Assassination (still). Producer shall pay Studio the aggregate sum of Six Thousand Dollars ($6,000). Received to date:  $3,000.

(d) Abe Mourns Willie. Producer shall pay Studio the aggregate sum of Six Thousand Dollars ($6,000). Received to date:  $3,000.

(e) Assassination (animated). Producer shall pay Studio the aggregate sum of Five Thousand Dollars ($5,000.00). Received to date:  $2,500.

(f) Lincoln on Stairs / Stares into Lens. Producer shall pay Studio the aggregate sum of Fourteen Thousand Dollars ($14,000.00). Received to date:  $7,000.

(g) Lincoln Falling Over. Producer shall pay Studio the aggregate sum of Ten Thousand Dollars ($10,000.00). Received to date:  $5,000.

(h) Lincoln Slumped in Chair. Producer shall pay Studio the aggregate sum of Two Thousand Dollars ($2,000.00). Received to date:  $1,000.

(i) Lincoln Walking Down the Street. Provided at no cost.

**8. Miscellaneous.**

Self Promotion:

Studio maintains the right to utilize any Materials included in this agreement for purposes of self promotion so long as it does not violate Producer's premiere broadcast and exclusive broadcast rights, as specified in Exhibit A and such Materials are utilized solely in a private and non-commercial manner prior to the initial broadcast of the Production.  Studio agrees to obtain written approval from History Channel for any other use not expressly set forth herein.

Studio has been forthright in informing both Producer and History Channel that certain of the materials have been exhibited prior to purchase of this license for self promotional purposes by Studio in various media including print, world wide web, and film festival venues (and as further detailed in the Exhibit "B" attached hereto) and Studio hereby represents and warrants that it has not licensed the Material for exhibition on television.

Jurisdiction:

Any dispute regarding this agreement shall be governed by the laws of the State of New York.

Sufficiency:

This agreement, along with the Exhibit "A", constitutes the entire agreement between the parties with respect to the subject matter hereof and merge all prior and contemporaneous communications.

Obligation:

Producer and Studio agree that Producer shall have no obligation to use the Materials in the Production, to release the Production and/or to otherwise exploit the Materials, subject to Producer's obligation to pay the applicable compensation for the Materials accepted by Producer.

AGREED TO AND ACCEPTED BY:

LEFT/RIGHT, INC.                          STUDIO MACBETH

By: _____     By: _____

Its: CO PRESIDENT                  Its: President

## EXHIBIT "A"

## "STEALING LINCOLN'S BODY"

### DELIVERY ITEMS:

1) **Coffin Video**
   (a)   <u>Exclusivity</u>: Exclusive use in broadcast television for eighteen (18) months, and non-exclusive use in broadcast television thereafter; exclusive use for twelve (12) months in all other media, commencing from initial broadcast of the Program, and non-exclusive use in any and all such media thereafter.

   (b)   <u>Term</u>:        In perpetuity, as of initial broadcast

   (c)   <u>Territory</u>:   Worldwide

2) **Funeral Procession (aka Teddy Roosevelt)**
   (a)   <u>Exclusivity</u>: Exclusive use in any and all media for three (3) years, commencing from initial broadcast of the Program; non-exclusive use in any and all media thereafter.

   (b)   <u>Term</u>:        In perpetuity, as of initial broadcast

   (c)   <u>Territory</u>:   Worldwide

3) **Assassination (still)**
   (a)   <u>Exclusivity</u>: Exclusive use in any and all media for three (3) years, commencing from initial broadcast of the Program;   non-exclusive use in any and all media thereafter.

   (b)   <u>Term</u>:        In perpetuity, as of initial broadcast

   (c)   <u>Territory</u>:   Worldwide

4) **Abe Mourns Willie**
   (a)   <u>Exclusivity</u>: Exclusive use in any and all media for three (3) years, commencing from initial broadcast of the Program; non-exclusive use in any and all media thereafter.

   (b)   <u>Term</u>:        In perpetuity, as of initial broadcast

   (c)   <u>Territory</u>:   Worldwide

5) **Assassination (animated)**
   (a)   <u>Exclusivity</u>: Exclusive to Producer in television prior to initial telecast (with the non-exclusive right to use in any and all media prior to and after initial telecast).

   (b)   <u>Term</u>:        In perpetuity, as of initial broadcast

   (c)   <u>Territory</u>:   Worldwide

6) **Lincoln on Stairs / Stares into Lens**
   (a)   Exclusivity: Exclusive to Producer in television prior to initial telecast (with the non-exclusive right to use in any and all media prior to and after initial telecast).

   (b)   Term:        In perpetuity, as of initial broadcast

   (c)   Territory:   Worldwide

7) **Lincoln Falling Over**
   (a)   Exclusivity: Exclusive to Producer in television prior to initial telecast (with the non-exclusive right to use in any and all media prior to and after initial telecast).

   (b)   Term:        In perpetuity, as of initial broadcast

   (c)   Territory:   Worldwide

8) **Lincoln Slumped in Chair**
   (a)   Exclusivity: Non-exclusive use in any and all media.

   (b)   Term:        In perpetuity, as of initial broadcast

   (c)   Territory:   Worldwide

9) **Lincoln Walking Down the Street**
   (a)   Exclusivity: Non-exclusive use in any and all media.

   (b)   Term:        In perpetuity, as of initial broadcast

   (c)   Territory:   Worldwide

## EXHIBIT "B"

## "STEALING LINCOLN'S BODY"

### DISCLOSURE OF EXHIBITED MATERIALS:

1. Non-animated exhibition of certain of the Materials, solely in part, on the Studio MacBeth website;

2. Exhibition of certain of the Materials to PBS and National Geographic via personal laptop but without "leave behinds".

3. Certain of the Materials appear in the movie "Glance Back" as part of the Cinequest Film Festival with such movie scheduled to be exhibited after the initial airing of the Production on History Channel.

EXHIBIT "B"

**Left/Right, Inc.**
145 West 28th Street, Seventh Floor
New York, New York 10001

As of June 23, 2009

Studio MacBeth, Inc.
302 Wall Street
Kingston, New York 12401
Attention: Ray Downing

Re:     "RESURRECTING JESUS"

Dear Ray:

This letter will confirm the agreement (the "Agreement") between Left/Right, Inc. ("Producer") and Studio MacBeth, Inc. ("Studio") whereby Producer has engaged Studio to render certain design services for and to license certain design elements to Producer, and to provide the on-camera appearance and producing services of Ray Downing ("Artist") in connection with the television project currently entitled "Resurrecting Jesus" (the "Program") and intended for initial broadcast on the History Channel ("Network"), on the following terms and conditions:

1.     **SERVICES:**

      (a)     Producer hereby engages Studio and Studio hereby accepts such engagement to create and furnish to Producer certain graphic animation sequences (collectively, the "Materials") and license the same to Producer subject to the terms and conditions of Studio's video licensing agreement (the "Licensing Agreement") attached hereto as Exhibit "A" and incorporated herein by this reference.

      (b)     Studio shall cause Artist to appear on camera in connection with the Program and to render co-producing, consulting and research services as reasonably required by Producer for the production, completion and delivery of the Program.

2.     **COMPENSATION:**

      (a)     Subject to Studio's execution and delivery of this Agreement, and provided Studio renders and completes all services in connection with the Materials hereunder as required by Producer, then Producer shall pay Studio the amounts set forth in paragraph 7(a) of the Licensing Agreement.

      (b)     Subject to Studio's execution and delivery of this Agreement, and provided Studio causes Artist to render and complete all of Artist's on-camera services and Artist's co-producer, consulting and research services hereunder as required by Producer, then for all rights granted to Producer hereunder, Producer shall pay Studio the all-inclusive sum of Thirty Thousand Dollars ($30,000) (subject to Artist's and/or Studio's breach or default, Artist's incapacity, and force majeure). The foregoing compensation shall be payable one-third (1/3) upon execution of this Agreement and the Licensing Agreement, one-third (1/3) upon delivery and acceptance of the first five (5) sequences of Materials by Producer and one-third (1/3) upon delivery to and acceptance of the Program by the Network, and shall be inclusive of Artist's services in connection with any pre-production, production and post-production services required on the Program and Studio shall not receive any

additional compensation for any repeat broadcasts of the Program or for overtime, holidays, weekends, or any number of hours or days worked, it being acknowledged and agreed that Artist's services shall be rendered on a no material interference, and the compensation as delineated above includes all such services.

(c)     Producer shall pay Studio the one-time, all inclusive sum of Twenty Thousand Dollars ($20,000) for any and all expenses related to any image licensing, travel, per diem, filming expenses and props related to the creation of the Materials, underlying artwork clearances, reference materials and any other such costs associated with the creation and production of the Materials hereunder.  Studio shall not be responsible for the payment any license fees related to any actual "Shroud of Turin" source images which may be used in the Program.  Studio shall coordinate and assist Producer in obtaining such image licensing.  The foregoing payment for expenses shall be payable one-third (1/3) upon execution of this Agreement and the Licensing Agreement, one-third (1/3) upon delivery and acceptance of the first five (5) sequences of Materials by Producer and one-third (1/3) upon delivery to and acceptance of the Program by the Network

(d)     In the event that Producer requests additional Materials in connection with the Program other than those set forth herein, and subject to Studio's execution and delivery of this Agreement, and provided Studio renders and completes all services in connection with the Materials hereunder as required by Producer, then Producer shall pay Studio the amounts set forth in paragraph 7(b) of the Licensing Agreement.

3.     **RIGHTS:**  Except as set forth in the Exhibit "A" with respect to the Materials, all of Artist's on-camera, co-producing, consulting and research services hereunder and the results and proceeds thereof shall be deemed a "work for hire" and Producer shall own all rights thereto, including, without limitation, the right to make any changes.  If such results and proceeds are deemed not a "work for hire", Studio and Artist hereby assign to Producer all rights therein, including copyrights, in perpetuity and throughout the universe, without any further compensation to Artist and/or Studio, and Producer shall have the sole and exclusive right to exploit such results and proceeds in any and all media, now known or hereafter devised, throughout the universe in perpetuity, without further compensation to Artist and/or Studio.  Studio and Artist exclusively grant and assign to Producer in perpetuity throughout the universe all so-called rental or lending rights, however denominated, now known or later devised. Artist and Studio waive any moral rights, *droit moral* and similar rights which Artist and/or Studio may have with respect to the Program.

4.     **SCREEN CREDIT:**

(a)     Provided Studio is not in material breach or material default hereof and Studio renders and completes all services necessary and required by Producer, and subject to Network approval, Producer agrees to accord Studio a screen credit, on a separate card, the placement, size, style, and duration of which shall be at Producer's sole discretion.

(b)     Provided Artist is not in material breach or material default hereof and Artist completes all services necessary and required by Producer, and subject to Network approval, Producer agrees to accord Artist a screen credit as "co-producer" the placement, size, style, and duration of which shall be at Producer's sole discretion.

No casual or inadvertent failure to comply with the credit or billing requirements shall be deemed a breach of this Agreement or the Licensing Agreement (provided that upon Producer's receipt of written notice by Studio of such failure to accord credit, Producer shall use reasonable business efforts to cure such failure on a prospective basis) and the sole remedy for breach of any of the billing provisions of this Agreement shall be an action at law for damages, it being agreed that in no event shall Studio seek or be entitled to injunctive or other equitable relief for breach of any of

the credit of billing requirements hereof, nor shall Studio be entitled to terminate this Agreement. Except as otherwise specified herein, the form, size, placement and appearance of the credit accorded to Studio under this Agreement shall be determined by Producer in its sole discretion

5.   **NAME AND LIKENESS**:   Producer, Network, their licensees and assignees (including any sponsors of the Program and their advertising agencies) shall have the right and may grant to others the right, in perpetuity, to disseminate, reproduce, print and publish Artist's name, likeness, voice and biographical material concerning Artist and Studio's name, logos and biographical material, as news or informative matter and in connection with advertising, merchandising and for purposes of trade solely with respect to the Program; provided, however, that in no event shall Producer, Network, the sponsors, if any, or their advertising agencies, if any, use or grant to any person the right to use any direct endorsement by Artist and/or Studio of any product or service without Artist's and/or Studio's prior written consent.

6.   **LOCATIONS**: Studio hereby grants to Producer the right to enter Studio's place of business (the "Studio Property") and to place cameras and other recording devices therein for the purpose of producing the Program.   Studio grants Producer the right to photograph, film and record and use in any manner any name, signs, logos on the Studio Property in connection with or as part of the Program and grants to Producer the right to reproduce, exhibit, advertise, and exploit all such photographs, film and recordings made on Studio Property in connection with the Program in any and all media, worldwide, in perpetuity.  If Studio does not own the Studio Property, but rather holds exclusive possession of the Studio Property pursuant to a lease agreement, Studio represents and warrants that it has obtained all necessary permissions and consents from the lessor of Studio Property and upon Producer's request, shall cause such lessor to execute a location agreement in the form specified by Producer.

7.   **REPRESENTATIONS AND WARRANTIES**: Studio represents, warrants and agrees that:

(a)Studio is free to enter into this Agreement and has the exclusive right to lend Artist's services hereunder and grant the rights herein provided.

(b)Any material furnished by Artist and/or Studio with respect to Artist's on-camera, co-producing, consulting and research services for inclusion in the Program, other than: (i) any portions supplied by Producer; (ii) are wholly original to Studio and/or Artist (as applicable); and, (iii) are not copied from any other work (unless such work is in the public domain)

(c)The results and proceeds of Artist's on-camera, co-producing, consulting and research services hereunder do not defame any person or violate any person's right of privacy or infringe upon any person's copyright or other such property or proprietary right, and are not the subject of any litigation.  Studio, on behalf of Artist, hereby indemnifies Producer, its successors, assignees and licensees, if any, against any and all claims, liabilities, costs, damages and expenses, including reasonable legal expenses (including attorney's fees), arising from any breach of these representations and warranties.

8.   **REMEDIES**: Studio and Artist acknowledge that in the event of a breach of any of Producer's obligations under this Agreement, the damage (if any) caused to Studio and/or Artist thereby is not irreparable or otherwise sufficient to give rise to a right of injunctive or other equitable relief; and Studio's and Artist's rights and remedies in the event of a breach of this Agreement by Producer shall be limited to the right, if any, to recover damages in an action at law and Studio shall not be entitled to restrict or interfere with Producer's right to produce, distribute and exploit the Program or any other program or other productions produced pursuant to this Agreement or the ancillary rights therein or otherwise exploit or exercise any of the rights granted to Producer hereunder.

401021-2

3

9.    **ASSIGNMENT**:  Producer will have the right to assign this Agreement in whole or in part to any third party with respect to (a) Artist's on-camera, co-producing, consulting and research services hereunder; and (b) all photographs, film and recordings made on Studio Property in connection with the Program.  Studio may not assign this Agreement without the prior written consent of Producer.  Any assignment of the Materials shall be subject to the terms and conditions contained in the Licensing Agreement.

10.   **PAYMENT**:  All payments which become due and owing to Studio and/or Artist will be paid by check made payable to Studio and mailed to the address specified above.

11.   **NO OBLIGATION**:   The parties agree that Producer shall have no obligation to use the Materials in the Program, to produce, complete, advertise, release or otherwise exploit the Program and/or to otherwise exploit the Materials or any of Artist's services hereunder, subject to Producer's obligation to pay the applicable compensation for the Materials accepted by Producer and/or compensation earned by Artist pursuant to this Agreement.

12.   **MISCELLANEOUS**:   The rights granted to Producer and the representations, warranties and indemnifications made by Studio hereunder will survive any termination of this Agreement.

13.   **ENTIRE AGREEMENT**:  This Agreement and the Exhibit "A" constitute the entire agreement and understanding between the parties and shall be interpreted in accordance with the laws of the State of New York.  In the event that the Exhibit "A" conflicts with the terms of this Agreement, the Agreement shall prevail.  No guild or union collective agreement applies to this Agreement.

Please indicate your acceptance, as of the date first mentioned above, by signing where indicated below.

Yours very truly,                                      AGREED TO AND ACCEPTED BY:

LEFT/RIGHT, INC.                                    STUDIO MACBETH

By: _____                By: _____

Its: ____CO PRESIDENT_____          Its: _____

                                                         Fed. I.D. #: _____

The undersigned hereby acknowledges that he has read and is familiar with each and every provision of the foregoing Agreement and hereby endorses and approves the Agreement and agrees to be bound thereby and to perform all of the terms and conditions thereof insofar as the same are to be performed by him.

_____
RAY DOWNING

<u>**EXHIBIT "A"**</u>

**"RESURRECTING JESUS"**

## Video Licensing Agreement

### 1. Mutual Understandings and Context of Agreement.

Both parties are given to understand that:

Left/Right (Producer) is engaged in the production of a television program currently entitled "Resurrecting Jesus" (Production) for the History Channel. Producer wishes to purchase a license from Studio Macbeth (Studio) for a minimum of ten (10) CGI/ graphics sequences of up to thirty (30) seconds each (the "Materials") for the inclusion within the Production.  Studio is the creator and owner of these Materials and has the right to grant such a license.  Studio is willing to do so under the terms listed herein.

All the terms in this Video Licensing Agreement (the "Licensing Agreement") refer only to these Materials and to their inclusion only in this particular television Production and to the promotion and exploitation of this particular television Production.

### 2. Grant of Rights. Subject to the terms of this agreement:

Any and all licenses granted by Studio are conditioned upon Producer's compliance with and execution of this Licensing Agreement and payment as required hereunder. Any and all licenses granted hereunder and rights to use the content shall terminate upon failure to comply with any provision of this Licensing Agreement, or failure to make full payment or failure to credit Studio (provided that the casual or inadvertent failure to provide such credit shall be not considered a breach of this Licensing Agreement giving rise to such termination right, and upon Producer's receipt of written notice by Studio of such failure to accord credit, Producer shall use reasonable business efforts to cure such failure on a prospective basis).

Studio shall be entitled to recover damages in an action at law but shall not be entitled to restrict or interfere with Producer's right to produce, distribute or exploit the Production. Studio grants to Producer the following exclusive and / or non-exclusive rights: Producer shall have exclusive use of the Materials in and in connection with the Program in any and all media for three (3) years, commencing from initial broadcast of the Program ("Exclusive Use Period") and perpetual, non-exclusive use in any and all media thereafter.  These rights are non-transferable, non-sublicenseable, and relate only to this particular Production. Studio is aware that the Production itself is being created for use by the History Channel and this License Agreement is specific to that usage alone.  Producer has the right but not the duty to use, adapt, edit, add to, subtract from, overdub, revise or alter the Materials as needed in connection with the advertising, promotion, publicity and exploitation of the Program, in any and all media or formats now or hereafter known, throughout the universe, in perpetuity, without additional compensation to Studio.

### 3. Restrictions.

Producer may not sublicense, sell, assign, convey, or transfer this Licensing Agreement or any of its rights under this Licensing Agreement, the sole exception being the History Channel (and it successors and assigns) as the acknowledged end user of these Materials. Producer may not make the licensed Materials available (separate from the end product into which it is incorporated) to any unauthorized users. Producer may not distribute any product containing the licensed Materials in a way that is intended to allow or invite a third party to download or extract the licensed material as a stand alone file. Producer may not falsely represent that Producer is the original creator of the work it has licensed. If the licensed Materials are reproduced in any derivative work based on the Production and which contains other screen credits, then subject to the relevant licensee approval, such derivative work must also include a credit to Studio.

Subject to Network approval, Producer must afford Studio a credit, on a separate card, in the end credit roll of the Production (or wherever similar type credits appear), provided that Studio has signed the Agreement and this Licensing Agreement, is not in material default of the Agreement or this Licensing Agreement, and the Production is actually broadcast.  No casual or inadvertent failure to comply with the credit or billing requirements shall be deemed a breach of either the Agreement or this Licensing Agreement (provided that upon Producer's receipt of written notice by Studio of such failure to accord credit, Producer shall use reasonable business efforts to cure such failure on a prospective basis), and the sole remedy for breach of any of the billing provisions of the Agreement or this Licensing Agreement shall be an action at law for damages, it being agreed that in no event shall Studio seek or be entitled to injunctive relief for breach of any of the credit of billing requirements hereof, nor shall Studio be entitled to terminate the Agreement or this Licensing Agreement.  Except as otherwise specified herein, the form, size, placement and appearance of the credit accorded to Studio under the Agreement and this Licensing Agreement shall be determined by Producer in its sole discretion.

### 4. Copyright, Ownership and Intellectual Property.

No ownership or copyright in any licensed Materials shall pass to the Producer by issuance of the license contained in this Licensing Agreement. Issuance of this license does not constitute rights, title, or interest in any of the intellectual, digital, software, or physical resources utilized in the creation of the Materials.  Similarly, inclusion of any licensed Materials in the Production shall not be deemed to transfer any ownership, copyright or any other intellectual property rights in the Production to the Studio.

### 5. Warranty and Limitation of Liability.

Studio warrants that it has the necessary rights and authority to enter into and perform this Licensing Agreement.  Except to the extent that Producer shall be responsible for securing the rights and clearances for materials furnished by Producer to Studio for inclusion in the Production and any "Shroud of Turin" images, Studio warrants that it has obtained all necessary rights and clearances with respect to the images contained in the Materials provided by Studio for inclusion in the Production.  Studio represents that the embellishments, dimensionalizations, and animations of the Materials are all original to Studio, and this new informational content is Studio's to license, and will not infringe on any copyright or intellectual property right of any third party.  Studio does not indemnify Producer from the consequences of not procuring proper rights and clearances on underlying materials furnished by Producer to Studio.

## 6. Mutual Indemnification.

Provided that licensed Materials are used in accordance with this Licensing Agreement and that the Producer is not in breach of this Licensing Agreement, Studio shall defend and indemnify Producer from any action arising out of any breach of Studio's warranty.

Producer shall defend and indemnify and hold harmless Studio from all damages, liabilities, and expenses arising out of claims by third parties relating to unauthorized use of underlying materials in the license to video clips.

The party seeking indemnification pursuant to section 6 shall promptly notify the other party of such claim.

## 7. Terms. Subject to the execution of the Agreement and this Licensing Agreement by Studio, payment for the Materials shall be payable as follows:

(a) Producer shall pay Studio the aggregate sum of Ten Thousand Dollars ($10,000) for each sequence of licensed Materials delivered to and accepted by Producer of up to thirty (30) seconds in length, with compensation for a minimum of ten (10) such sequences guaranteed (subject to Studio's breach or default or force majeure), payable fifty percent (50%), execution of this Agreement and the Licensing Agreement, twenty-five percent (25%) upon delivery and acceptance of the first five (5) sequences of Materials by Producer and twenty-five percent (25%) upon delivery to and acceptance of the Program by the Network.

(b) In the event that Producer requests additional Materials in connection with the Program other than those set forth in paragraph 7(a) above, Studio and Producer agree that for each additional sequence of Materials requested by Producer and which conforms to the same specifications as set forth in paragraph 2(a) above, Producer shall pay Studio the all-inclusive sum of Ten Thousand Dollars ($10,000) for each such additional sequence of Materials, subject to the terms and conditions hereof. If Producer requests additional Materials in connection with the Program which do not conform to the same specifications as set forth in paragraph 7(a) above, any and all costs associated therewith shall be subject good faith negotiations between the parties hereto and further provided that each such additional sequence of Materials fee shall be preapproved in writing and subject to Producer's budgetary parameters.

Any and all other payments which may become due or owing in connection with Studio's services in connection with the Production shall be payable as set forth in paragraph 2(c) of the Agreement or paragraph 7(b) above, as applicable.

## 8. Miscellaneous.

Self Promotion:

Studio maintains the right to utilize any Materials included in this Licensing Agreement for purposes of self promotion so long as it does not violate Producer's premiere broadcast and exclusive broadcast rights, pursuant to Paragraph 2 of the Licensing Agreement and such Materials are utilized solely in a private and non-commercial manner prior to the initial broadcast of the Production. Studio shall have the right to exhibit the Materials on Studio's website after the initial television broadcast of the Production. Studio agrees to obtain written approval from History Channel for any other use not expressly set forth herein.

Studio hereby represents and warrants that it has not licensed nor will Studio license the Material for exhibition in any media during the Exclusive Use Period.

Jurisdiction:

Any dispute regarding this Licensing Agreement shall be governed by the laws of the State of New York.

Sufficiency:

This Licensing Agreement, along with the Agreement, constitutes the entire agreement between the parties with respect to the subject matter hereof and merge all prior and contemporaneous communications.  In the event this Licensing Agreement conflicts with the terms of the Agreement, the Agreement shall prevail

AGREED TO AND ACCEPTED BY:

LEFT/RIGHT, INC.                                      STUDIO MACBETH

By: _____              By: _____

Its: _CO PRESIDENT_____                    Its: _____

401021-2                                                                                              8

EXHIBIT "C"

Left/Right, Inc.
39 W. 19th Street, 9th Fl
New York, NY 10011

As of September 21, 2010

Studio Macbeth, Inc.
302 Wall Street
Kingston, New York 12401
Attention: Ray Downing

Re:     "LOST 40 DAYS"

Dear Ray:

This letter will confirm the agreement (the "Agreement") between Left/Right, Inc. ("Producer") and Studio MacBeth, Inc. ("Studio") whereby Producer has engaged Studio to render certain design services for, and to license certain design elements to Producer, and to provide the on-camera appearance and producing services of Ray Downing ("Artist") in connection with the television project currently entitled "Lost 40 Days" (the "Program") and intended for initial broadcast on the History Channel ("Network"), on the following terms and conditions:

1.    SERVICES:

    (a)    Producer hereby engages Studio and Studio hereby accepts such engagement to create and furnish to Producer certain graphic animation sequences (the "Materials") (as set forth in Schedule 1 attached hereto and incorporated herein by this reference), and license the same to Producer subject to the terms and conditions of Studio's video licensing agreement (the "Licensing Agreement") attached hereto as Exhibit "A" and incorporated herein by this reference.

    (b)    Studio shall cause Artist to appear on-camera in connection with the Program and to render co-producing, consulting and research services as reasonably required by Producer for the production, completion and delivery of the Program; including, but not limited to: assistance with      concept and outlines for the show; research underwriting the content; active communications with the show's writer; assistance in identifying and soliciting suitable expert interviewees; assistance in preparing questions for interviewees; preparing demonstrations for on camera filming; furnishing props; and personal appearances related to promotion of the show.

2.    COMPENSATION:

    (a) Subject to Studio's and Artist's execution and delivery of this Agreement and the Licensing Agreement, and provided Studio renders and completes all services in connection with the Materials hereunder and causes Artist to render and complete all of Artist's on-camera, co-producer, consulting and research services hereunder, as required by Producer, then for all rights granted to Producer hereunder (including, without limitation, the rights granted pursuant to the Licensing Agreement), Producer shall pay Studio the all-inclusive

sum of One Hundred and Twenty Thousand Dollars ($120,000) (subject to Artist's and/or Studio's breach or default, Artist's incapacity, and force majeure). The foregoing compensation shall be payable fifty percent (50%) upon execution of this Agreement and the Licensing Agreement; twenty-five percent (25%) upon delivery to and acceptance by Producer of the Materials; and twenty-five percent (25%) upon delivery to and acceptance of the Program by the Network, and shall be inclusive of (i) the license set forth in the Licensing Agreement, and (ii) Artist's services in connection with any pre-production, production and post-production services required on the Program, and Studio shall not receive any additional compensation for any repeat broadcasts of the Program or for overtime, holidays, weekends, or any number of hours or days worked, it being acknowledged and agreed that Artist's services shall be rendered on a non-exclusive, no material interference basis, and the compensation as delineated above includes all such services.

(b)     In the event that Producer requests additional Materials in connection with the Program other than those set forth herein, and subject to Studio's execution and delivery of this Agreement, and provided Studio renders and completes all services in connection with the Materials hereunder as required by Producer, then Producer shall pay Studio as set forth in paragraph 7(b) of the Licensing Agreement.

(c)     Subject to Producer's advance approval in writing, Producer will reimburse Studio for Studio's reasonable, actual, out-of-pocket expenses relating to the filming of interviews and location footage which require the participation of Studio and or employees thereof, including traveling, lodging, and per diem expenses, and subject to Producer's receipt of adequate documentation thereof in form and substance reasonably satisfactory to Producer. All such payments shall be made within ten (10) business days of Producer's receipt of such documentation. Studio shall not be responsible for the payment of any license fees related to any actual "Shroud of Turin" source images which may be used in the Program. Studio shall coordinate and use best efforts to assist Producer in obtaining such image licensing.

3.   <u>RIGHTS</u>: Except as set forth in the Exhibit "A" with respect to the Materials, all of Artist's on-camera, co-producing, consulting and research services hereunder, and the results and proceeds thereof, shall be deemed a "work-for-hire" for Producer and Producer shall own all rights thereto, including, without limitation, the right to make any changes in Producer's sole discretion. If such results and proceeds are for any reason deemed not to be a "work for hire", Studio and Artist hereby irrevocably assign to Producer all rights therein, including copyrights, in perpetuity and throughout the universe, without any further compensation to Artist and/or Studio, and Producer shall have the sole and exclusive right to exploit such results and proceeds in any and all media, now known or hereafter devised, throughout the universe in perpetuity, without further compensation to Artist and/or Studio. Studio and Artist exclusively grant and assign to Producer in perpetuity throughout the universe all so-called rental or lending rights, however denominated, now known or later devised. Artist and Studio waive any moral rights, droit moral and similar rights which Artist and/or Studio may have with respect to the Program.

4.   <u>SCREEN CREDIT</u>:

(a)     Provided Studio is not in material breach or material default hereof and Studio renders and completes all services necessary and required by Producer, and subject to Network

approval and policies, Producer agrees to accord Studio an "Animation by" screen credit, in the end titles of the Program, the placement, size, style, and duration of which shall be at Producer's sole discretion.

(b)     Provided Studio is not in material breach or material default hereof and Studio renders and completes all services necessary and required by Producer, and subject to Network approval and policies, Producer agrees to accord Studio a "Videography by" screen credit, in the end titles of the Program, the placement, size, style, and duration of which shall be at Producer's sole discretion.

(c)     Provided Artist is not in material breach or material default hereof and Artist completes all services necessary and required by Producer, and subject to Network approval and policies, Producer agrees to accord Artist a "producer" screen credit in the end titles of the Program, the placement, size, style, and duration of which shall be at Producer's sole discretion.

No casual or inadvertent failure to comply with any of the credit provisions hereunder shall be deemed a breach of this Agreement or the Licensing Agreement (provided that upon Producer's receipt of written notice by Studio of such failure to accord credit, Producer shall use reasonable business efforts to cure such failure on a prospective basis) and the sole remedy for breach of any of the credit provisions hereunder shall be an action at law for damages, it being agreed that in no event shall Studio seek or be entitled to injunctive or other equitable relief for breach of any of the credit provisions hereunder, nor shall Studio be entitled to terminate this Agreement. Except as otherwise specified herein, the form, size, placement and appearance of the credit accorded to Studio under this Agreement shall be determined by Producer in its sole discretion

5.     NAME AND LIKENESS:  Producer, Network, their licensees and assignees (including any sponsors of the Program and their advertising agencies) shall have the right and may grant to others the right, in perpetuity, to disseminate, reproduce, print and publish Artist's name, likeness, voice and biographical material concerning Artist and Studio's name, logos and biographical material, as news or informative matter and in connection with advertising, merchandising and for purposes of trade solely with respect to the Program; provided, however, that in no event shall Producer, Network, the sponsors, if any, or their advertising agencies, if any, use or grant to any person the right to use any direct endorsement by Artist and/or Studio of any product or service without Artist's and/or Studio's prior written consent.

6.     LOCATIONS:  Studio hereby grants to Producer the right to enter Studio's place of business (the "Studio Property") and to place cameras and other recording devices therein for the purpose of producing the Program.  Studio shall use best efforts to assist Producer in obtaining any appearance releases from Studio employees and staff for no additional compensation.  Studio grants Producer the right to photograph, film and record and use in any manner any name, signs, logos and/or trademarks on the Studio Property in connection with or as part of the Program and grants to Producer the right to reproduce, exhibit, advertise, and exploit all such photographs, film and recordings made on Studio Property in connection with the Program in any and all media, worldwide, in perpetuity.  If Studio does not own the Studio Property, but rather holds exclusive possession of the Studio Property pursuant to a lease agreement, Studio represents and warrants that it has obtained all necessary permissions and consents from the lessor of Studio Property and upon Producer's request, shall cause such lessor to execute a location agreement in the form specified by Producer.

7.   REPRESENTATIONS AND WARRANTIES: Studio represents, warrants and agrees that:

    (a)    Studio is free to enter into this Agreement and has the exclusive right to lend Artist's services hereunder and grant the rights herein provided.

    (b)    Any material furnished by Artist and/or Studio with respect to Artist's on-camera, co-producing, consulting and research services for inclusion in the Program, other than any portions supplied by Producer are wholly original to Studio and/or Artist (as applicable) and are not copied from any other work (unless such work is in the public domain).

    (c)    The results and proceeds of Artist's on-camera, co-producing, consulting and research services hereunder do not defame any person or violate any person's right of privacy or infringe upon any person's copyright or other such property or proprietary right, and are not the subject of any litigation. Studio, on behalf of Artist, hereby indemnifies Producer, its successors, assignees and licensees, if any, against any and all claims, liabilities, costs, damages and expenses, including reasonable legal expenses (including attorney's fees), arising from any breach of these representations and warranties.

8.   REMEDIES: Studio and Artist acknowledge that in the event of a breach of any of Producer's obligations under this Agreement, the damage (if any) caused to Studio and/or Artist thereby is not irreparable or otherwise sufficient to give rise to a right of injunctive or other equitable relief; and Studio's and Artist's rights and remedies in the event of a breach of this Agreement by Producer shall be limited to the right, if any, to recover damages in an action at law and Studio and/or Artist shall not be entitled to restrict or interfere with Producer's right to produce, distribute or exploit the Program or any other program or other productions produced pursuant to this Agreement or the ancillary rights therein or otherwise exploit or exercise any of the rights granted to Producer hereunder.

9.   ASSIGNMENT: Producer will have the right to assign this Agreement in whole or in part to any third party with respect to (a) Artist's on-camera, co-producing, consulting and research services hereunder; and (b) all photographs, film and recordings made on Studio Property in connection with the Program. Studio may not assign this Agreement without the prior written consent of Producer. Any assignment of the Materials shall be subject to the terms and conditions contained in the Licensing Agreement.

10.  PAYMENT: All payments which become due and owing to Studio and/or Artist will be paid by check made payable to Studio and mailed to the address specified above.

11.  NO OBLIGATION: The parties agree that Producer shall have no obligation to use the Materials in the Program, to produce, complete, advertise, release or otherwise exploit the Program and/or to otherwise exploit the Materials or any of Artist's services hereunder, subject to Producer's obligation to pay the applicable compensation for the Materials accepted by Producer and/or compensation earned by Artist pursuant to this Agreement.

12.  MISCELLANEOUS: The rights granted to Producer and the representations, warranties and indemnifications made by Studio hereunder will survive any termination of this Agreement.

13.   ENTIRE AGREEMENT: This Agreement and the Exhibit "A" constitute the entire agreement and understanding between the parties and shall be interpreted in accordance with the laws of the State of New York. In the event that the Exhibit "A" conflicts with the terms of this Agreement, the Agreement shall prevail. No guild or union collective agreement applies to this Agreement.

Please indicate your acceptance, as of the date first mentioned above, by signing where indicated below.

Yours very truly,                             AGREED TO AND ACCEPTED BY:
LEFT/RIGHT, INC.                              STUDIO MACBETH

By: _____                       By: _____ Ray Downing _____
Its: _____                      Its: _____ President _____
                                              Fed. I.D. #: ███████████

The undersigned hereby acknowledges that he has read and is familiar with each and every provision of the foregoing Agreement and hereby endorses and approves the Agreement and agrees to be bound thereby and to perform all of the terms and conditions thereof insofar as the same are to be performed by him.

_____
RAY DOWNING

448143_5                                                                          5

EXHIBIT "A"

"LOST 40 DAYS"

# Video Licensing Agreement

## 1. Mutual Understandings and Context of Agreement.

Both parties are given to understand that:

Left/Right, Inc. ("Producer") is engaged in the production of a television program currently entitled "Lost 40 Days" ("Production") for the History Channel for which Producer wishes to engage the services of Studio Macbeth ("Studio") pursuant to an agreement dated as of September 21, 2010 (the "Agreement").  Pursuant to the Agreement, Producer wishes to obtain an exclusive license for a minimum of six (6) CGI/graphics sequences (the "Materials"; set forth in Schedule 1 attached hereto) for inclusion within the Production.  The length of each sequence is to be mutually agreed upon by the parties.  Studio is the creator and owner of these Materials and has the right to grant such a license.  Studio is willing to do so under the terms listed herein.

All the terms in this Video Licensing Agreement (the "Licensing Agreement") refer only to these Materials and to their inclusion only in this particular television Production and to the promotion and exploitation of this particular television Production.

## 2. Grant of Rights. Subject to the terms of this agreement:

Any and all licenses granted by Studio are conditioned upon Producer's compliance with and execution of this Licensing Agreement and payment as required hereunder. Any and all licenses granted hereunder and rights to use the content shall terminate upon failure to comply with any provision of this Licensing Agreement, or failure to make full payment or failure to credit Studio (provided that the casual or inadvertent failure to provide such credit shall be not considered a breach of this Licensing Agreement giving rise to such termination right, and upon Producer's receipt of written notice by Studio of such failure to accord credit, Producer shall use reasonable business efforts to cure such failure on a prospective basis).

Studio shall be entitled to recover damages in an action at law but shall not be entitled to seek injunctive relief or to restrict or interfere with Producer's right to produce, distribute or exploit the Production. Studio grants to Producer the following exclusive and / or non-exclusive rights: Producer shall have exclusive use of the Materials in and in connection with the Program in any and all media for three (3) years, commencing from initial broadcast of the Program ("Exclusive Use Period") and perpetual, non-exclusive use in any and all media thereafter.  These rights are non-transferable, non-sublicenseable (except with respect to the History Channel), and relate only to this

particular Production. Studio is aware that the Production itself is being created for use by the History Channel and this License Agreement is specific to that usage alone. Producer has the right but not the duty to use, adapt, edit, add to, subtract from, overdub, revise or alter the Materials as needed in connection with the advertising, promotion, publicity and exploitation of the Program, in any and all media or formats now or hereafter known, throughout the universe, in perpetuity, without additional compensation to Studio.  It is acknowledged by both parties that Studio is licensing specific animation clips.  The models, sets, algorhythms, and creation materials remain the property of Studio and Studio retains the right to use these materials without restriction and to generate derivative still images based on these materials; provided, however, that such materials are separate and distinct from the Materials set forth in Schedule 1 hereto and exclusively licensed to Producer as set forth hereinabove.

## 3. Restrictions.

Producer may not sublicense, sell, assign, convey, or transfer this Licensing Agreement or any of its rights under this Licensing Agreement, the sole exception being the History Channel (and it successors and assigns) as the acknowledged end user of these Materials. Producer may not make the licensed Materials available (separate from the end product into which it is incorporated) to any unauthorized users. Producer may not distribute any product containing the licensed Materials in a way that is intended to allow or invite a third party to download or extract the licensed material as a stand alone file. Producer may not falsely represent that Producer is the original creator of the work it has licensed. If the licensed Materials are reproduced in any derivative work based on the Production and which contains other screen credits, then subject to the relevant licensee approval, such derivative work must also include a credit to Studio.

Subject to Network approval, Producer shall afford Studio a credit, on a separate card, in the end credit roll of the Production (or wherever similar type credits appear), provided that Studio has signed the Agreement and this Licensing Agreement, is not in material default of the Agreement or this Licensing Agreement, and the Production is actually broadcast.  No casual or inadvertent failure to comply with the credit or billing requirements shall be deemed a breach of either the Agreement or this Licensing Agreement (provided that upon Producer's receipt of written notice by Studio of such failure to accord credit, Producer shall use reasonable business efforts to cure such failure on a prospective basis), and the sole remedy for breach of any of the billing provisions of the Agreement or this Licensing Agreement shall be an action at law for damages, it being agreed that in no event shall Studio seek or be entitled to injunctive relief for breach of any of the credit of billing requirements hereof, nor shall Studio be entitled to terminate the Agreement or this Licensing Agreement.  Except as otherwise specified herein, the form, size, placement and appearance of the credit accorded to Studio under the Agreement and this Licensing Agreement shall be determined by Producer in its sole discretion.

## 4. Copyright, Ownership and Intellectual Property.

No ownership or copyright in any licensed Materials shall pass to the Producer by issuance of the license contained in this Licensing Agreement. Issuance of this license does not constitute rights, title, or interest in any of the intellectual, digital, software, or physical resources utilized in the creation of the Materials. Similarly, inclusion of any licensed Materials in the Production shall not be deemed to transfer any ownership, copyright or any other intellectual property rights in the Production to the Studio.

## 5. Warranty and Limitation of Liability.

Studio warrants that it has the necessary rights and authority to enter into and perform this Licensing Agreement. Except to the extent that Producer shall be responsible for securing the rights and clearances for materials furnished by Producer to Studio for inclusion in the Production as well as any "Shroud of Turin" images, Studio warrants that it has obtained all necessary rights and clearances with respect to the images contained in the Materials provided by Studio for inclusion in the Production. Studio represents that the embellishments, dimensionalizations and animations of the Materials are all original to Studio, and this new informational content is Studio's to license, and will not infringe on any copyright or intellectual property right of any third party. Studio does not indemnify Producer from the consequences of not procuring proper rights and clearances on underlying materials furnished by Producer to Studio.

## 6. Mutual Indemnification.

Provided that licensed Materials are used in accordance with this Licensing Agreement and that the Producer is not in breach of this Licensing Agreement, Studio shall defend and indemnify Producer from any action arising out of any breach of Studio's warranty.

Producer shall defend and indemnify and hold harmless Studio from all damages, liabilities, and expenses arising out of claims by third parties relating to unauthorized use of underlying materials in the license to video clips.

The party seeking indemnification pursuant to section 6 shall promptly notify the other party of such claim.

## 7. Terms.

(a)   Subject to the execution of the Agreement and this Licensing Agreement by Studio, and provided that Studio is not in material breach of the Agreement or this Licensing Agreement, Studio shall be paid for the Materials pursuant to the terms set forth in Paragraph 2 of the Agreement.

(b)  In the event that Producer requests additional Materials in connection with the Program other than those set forth in Schedule 1, Studio and Producer agree that for

each additional sequence of Materials requested by Producer, any and all costs associated therewith shall be subject to good faith negotiations between the parties hereto and further provided that each such additional sequence of Materials fee shall be preapproved in writing and subject to Producer's budgetary parameters, with payment in full due upon delivery to and acceptance by Producer.

8. Miscellaneous.

Self Promotion:

Studio maintains the right to utilize any Materials included in this Licensing Agreement for purposes of self promotion so long as it does not violate Producer's premiere broadcast and exclusive broadcast rights, pursuant to Paragraph 2 of the Licensing Agreement and such Materials are utilized solely in a private and non-commercial manner prior to the initial broadcast of the Production. Studio shall have the right to exhibit the Materials on Studio's website after the initial television broadcast of the Production. Studio agrees to obtain written approval from History Channel for any other use not expressly set forth herein.

Studio hereby represents and warrants that it has not licensed nor will Studio license the Material for exhibition in any media during the Exclusive Use Period.

Jurisdiction:

Any dispute regarding this Licensing Agreement shall be governed by the laws of the State of New York.

Sufficiency:

This Licensing Agreement, along with the Agreement, constitutes the entire agreement between the parties with respect to the subject matter hereof and merge all prior and contemporaneous communications. In the event this Licensing Agreement conflicts with the terms of the Agreement, the Agreement shall prevail

AGREED TO AND ACCEPTED BY:
LEFT/RIGHT, INC.

By: _____

Its: _____

STUDIO MACBETH

By: _____

Its: __President__

## SCHEDULE 1

## "Materials"

## "LOST 40 DAYS"

SEQUENCES:  Six (6) post-resurrection appearance sequences featuring the Real Face of Jesus.

1. The appearance to Mary Magdalene outside the tomb [_ _:_ _];
2. The encounter on the road to Emmaus [_ _:_ _];
3. The appearance through locked doors to the ten apostles [_ _:_ _];
4. The appearance to Thomas and the ten apostles [_ _:_ _];
5. The appearance at the shore of Galilee [_ _:_ _]; and
6. Jesus' ascension [_ _:_ _].

Michael Trauben, Esq. (SBN: 277557)
400 S. Beverly Drive
Suite 400
Beverly Hill, CA 90212

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND DOWNING and STUDIO MACBETH, INC. | CASE NUMBER |
| PLAINTIFF(S) | CV12-06011 PSWL (ATWx) |
| v. | |
| LEFT RIGHT, INC. and A&E TELEVISION NETWORKS, LLC | SUMMONS |
| _see attached_    DEFENDANT(S). | |

TO:   DEFENDANT(S): LEFT RIGHT, INC. and A&E TELEVISION NETWORKS, LLC

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _____Michael Trauben, Esq._____, whose address is __400 S. Beverly Drive, Suite 400, Beverly Hills, CA 90212__.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

JUL 12 2012

Clerk, U.S. District Court

JULIE PRADO

Dated: _____

By: _____
        Deputy Clerk
                              1154

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                SUMMONS

Michael Trauben, Esq. (SBN: 277557)
400 S. Beverly Drive
Suite 400
Beverly Hill, CA 90212

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND DOWNING and STUDIO MACBETH, INC.<br><br>                                              PLAINTIFF(S)<br>                   v.<br><br>LEFT RIGHT, INC. and A&E TELEVISION NETWORKS, LLC<br><br>_see attached_                   DEFENDANT(S). | CASE NUMBER<br><br>CV12-06011 PSWL (AJWx)<br><br><br><br><br>**SUMMONS** |

TO:    DEFENDANT(S): <u>LEFT RIGHT, INC. and A&E TELEVISION NETWORKS, LLC</u>

A lawsuit has been filed against you.

Within   21   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _____ Michael Trauben, Esq. _____, whose address is 400 S. Beverly Drive, Suite 400, Beverly Hills, CA 90212 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

JUL 1 2 2012                              Clerk, U.S. District Court

Dated: _____      By: _____
                                                   Deputy Clerk

                                                   _(Seal of the Court)_

_[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)]._

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Ronald S. W. Lew and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

### CV12- 6011 RSWL (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

======================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Raymond Downing
Studio Maebath, Inc.

**DEFENDANTS**
Left Right, Inc.
A&E Television Networks, LLC

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Michael Trauben, Esq. (SBN: 277557)
Singh, Singh & Trauben, LLP, 400 S. Beverly Drive, Suite 400
Beverly Hills, CA 90212; Tel: 310.856.9705

**Attorneys** (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No  ☑ **MONEY DEMANDED IN COMPLAINT:** $ Damages > $500,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Copyright Infringement (17 U.S.C. §§ 101), Breach of Contract, Unjust Enrich., Breach of Covenant GF and Fair Dealing, Accounting, Violation of Publicity, Fraud

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☑ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

CV12-06011

**FOR OFFICE USE ONLY:** Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)  CIVIL COVER SHEET  Page 1 of 2

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

VIII(a). IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

VIII(b). RELATED CASES: Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Raymond Downing: Ulster County, New York<br>Studio Macbeth, Inc.: Ulster County, New York |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Left Right, Inc.: New York, New York<br>A&E Television Networks, LLC: New York, New York |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Copyright Infringement: Los Angeles County | Fraud: New York, New York |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date July 12, 2012

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |